HAWAII HOUSING AUTHORITY, a public body and a body corporate and politic, Plaintiff-Appellee, *v.* RICHARD LYMAN, JR., MATSUO TAKABUKI, MYRON B. THOMPSON, WILLIAM S. RICHARDSON and HENRY H. PETERS, Trustees of the Kamehameha Schools/Bishop Estate, and KAISER HAWAII-KAI DEVELOPMENT CO., a Nevada corporation, KAISER AETNA, a California corporation, and KACOR REALTY, INC., a California corporation, Defendants-Appellants, and SALEEM AHMED, CAROL Y. AHMED, DOUGLAS E. ANDERSON, ANNE E. ANDERSON, BRYAN L. ANZAI, JUNE H. ANZAI, THOMAS T. ARAGAKI, JR., CAROLYNNE K. ARAGAKI, HAROLD Z. ARAKAKI, WALTER K. ASHITOMI, ETHEL N. ASHITOMI, ADRIAN Q. H. AU, ANDREA R. AU, GAIL K. F. AU, GRACE P. E. AU, WILLIAM T. BEATTIE, JUANITA J. BEATTIE, MERLE R. BEGHTEL, LORNA N. BEGHTEL, FRANK P. BERTOLDO, JOYCE E. BERTOLDO, FLORIAN P. BIANCHI, JR., FRED R. BOLL, LEATRICE R. BOLL, PAUL F. O. BRITOS, BARBARA E. BRITOS, RUSSELL S. BROWN, EVELYN L. BROWN, WARD B. BROWN, MOSES H. BURROWS, BEATRICE L. H. BURROWS, CYRUS T. P. CHI, FAYE A. CHI, ROBERT T. CHIBANA, ROSEMAE N. CHIBANA, STEVEN H. K. CHANG, TAMMIE C. J. CHANG, WU ON CHIN, LAI KUEN CHIN, CLARENCE K. H. CHING, SUMIKO CHING, DELWIN P. K. CHING, ERIC Y. L. CHING, LAURA L. K. N. CHING, ARTHUR L. CHONG, SYLVIA S. J. CHOY, GODWIN C. CHU, JULIA C. CHU, STEPHEN M. S. CHUN, GAIL C. CHUN, MELVIN H. COCKETT, MICHELLE ANN COCKETT, DEWEY L. CONNER, PATRICIA CONNER, DAVID B. CRAIG, ALBERT L. DALTON, EDITH C. DALTON, RESURRECCION B. DARVAL, WILLIAM C. DECKER, NANCY G. DECKER, ROBERTA R. DIAS, RAY G. DIX, DONNA M. DIX, SAMUEL N. EISMEN, MARIANNE EISMEN, RICHARD M. ELLIS, JR., SHIZUKO M. ELLIS, RICHARD H. EMERSON, CAROL K. EMERSON, MICHAEL M. ESTERBROOK, YUMIKO ESTERBROOK, TA KUNG FINE, SHIRLEY H. L. L. FINE, SAMUEL S. FOSTER, JR., CAROLINE T. FOSTER, KENNETH K. FUJII, ICHIRO FUKUMOTO, JEAN T. FUKUMOTO, MORRIS M. FURUBAYASHI, MARJORIE T. FURUBAYASHI, KAIZO FURUYA, JUDY M. FURUYA, JAMES A.

FURUYAMA, LOREEN M .FURUYAMA, EUGENE L. GELFO, II, JO CAROL GELFO, FERNANDO J. GEORGE, NOELIA GEORGE, ERICH P. GERHOLD, MARGARIT D. GERHOLD, DU SHUN GIM, KYUNGNIN Y. GIM, LAWRENCE Y. L. GO. SR., ELLEN M. GO, TAKENORI GOJO, YASUMI GOJO, KAKKALA GOPALAKRISHNAN, VIJAYALEKSHMY GOPALAKRISHNAN, JAY P. GURIAN, JULIA M. GURIAN, EDWARD M. HAMADA, ARLEAN N. HAMADA, CARY S. HANAOKA, AMY E. HANAOKA, WAYNE H. HARADA, VIOLET H. HARADA, RODNEY K. HARAGA, JANE S. HARAGA, SAMUEL T. HASEGAWA, AMY Y. HASEGAWA, GLENN M. HASHIMOTO, LINDY M. HASHIMOTO, UMEO HASHIRO. CAROLE Q. HASHIRO, JACK HAWLEY, MARTA HAWLEY, STANLEY I. HAYASHI, RUTH K. HAYASHI, MELVIN J. N. HEE, NATHALIE L. J. HEE, FUMIO HIDANO, YAEKO HIDANO, JAMES M. HIGA, MERLE N. HIGA, WALLACE M. HIGASHI, EUNICE T. HIGASHI, GARY I. HIRAIWA, MARGARET F. HIRAIWA, AKIRA HIRONAGA, MISAKO HIRONAGA, JAMES S. HOLDERNESS, ARDELLE S. HOLDERNESS, EDWARD M. HOLLACHER, OPAL J. HOLLACHER, HARVEY O. HONDA, VIRGINIA S. HONDA, HORACE H. HONDA, FRIEDA M. HONDA, MATTHEW C. H. HONG, KATHERINE S. HONG, PAUL S. H. HONG, ETHEL S. Y. K. HONG, MORDECAI H. HUDSON, III, MARY S. HUDSON, KATHY A. HUFFMAN, ALAN N. HUGHGILL, CHARLES T. IIDA. WINIFRED F. IIDA, HARUYOSHI IKAWA, ELINOR T IKAWA. DONNA R. IKEDA. KENNETH T INADA, BARBARA S. INADA. WAYNE S. INAMINE. SHARON O. INAMINE, EDWIN T. INOUYE, SUZETTE S INOUYE. WILLIAM IRVINE. LARRY H. ISOBE. EDNA C. ISOBE, MICHAEL H. ITO, PATRICIA J. ITO, CARL G. IZUMI, SUSAN Y. IZUMI, THOMAS M. JASKUNAS, CAROL L. JASKUNAS, GORDON K. S. JAY, ROY H. KADOOKA, LORRAINE S. KADOOKA, GEORGE K. Y. KAI, MARTHA B. Y. KAI, EDITH M. KAHAKELII, GORDON K. KAMAKAHI, LUANA L. KAMAKAHI, ROBERT T. KANESHIRO, FAITH R. KANESHIRO, ROY A. KANESHIRO, JUNE J. KANESHIRO, RONALD T. KASHIMOTO, CAROL JANE S. KASHIMOTO, CLIFFORD H. KASHIWABARA, LILLIAN KASHIWABARA,

JAMES K. KASHIWAI, AKIE KASHIWAI, STEPHEN K. KAS-PEROWICZ, ROBERTA J. KASPEROWICZ, NOBUKO KATO, RICHARD T. KATO, LEONA Y. KATO, THEODORE S. KAWAHIGASHI, DANA T. KAWAHIGASHI, THOMAS S. KAWASAKI, LINDA H. KAWASAKI, CHESTER M. KAWA-SHIGE, SHIRLEY J. KAWASHIGE, MARTIN W. KEOUGH, SHIRLEY M. KEOUGH, GEORGE K. KIKUCHI, MARIAN K. KIKUCHI, SOO BOK KIM, MARY KIM, WENDELL S. H. KIM, ELSIE T. KIM, ARTHUR I. KIMURA, RENE M. KIMURA, SEIJI KODAMA, LINDA H. KODAMA, FRED-ERICK T. KOGA, JAYNE K. KOGA, NORMAN M. KOGA, NANNETTE S. C. KOGA, KENT KOIKE, NANCY N. KOIKE, ARTHUR A. KOJIMA, BARBARA A. KOJIMA, STANLEY I. KOKI, SUMIKO K. KOKI, JOHAN C. KOORENHOF, MARIA G. KOORENHOF, RONALD S. KUBO, SR., BERNADETTE C. KUBO, HARRY T. KUBOTA, BETSY K. KUBOTA, SCOTT S. KUNIMURA, ANN T. KUNIMURA, LINDY T. KUNISHIMA, GERALDINE N. KUNISHIMA, ERNEST T. KUROSAWA, SUMIYE O. KUROSAWA, ROBERT LACNO, EVELYN D. LACNO, DON LAMOND, SUSAN M. LAMOND, LAWRENCE L. LANGLEY, LINDA JO LANGLEY, GORDON M Y. LAU, ROBERT C. LAWTON, KATHLEEN R. LAWTON, HOWARD K. T. LEE, ESTHER K. C. LEE, BRADLEY K. LEE, GINNY T. LEE, WALTER LIEBETRAU, JEAN M. LIEBETRAU, THOMAS L. L. LIMM, CAROLINE A. H. LIMM, GEORGE Y. H. LIU, MARIAN K. LIU, MELVIN D. LLOYD, ARLENE D. LLOYD, ELDEN LOEFFELHOLZ, PATRICIA L. LOEFFEL-HOLZ, JOSEPH H. LOEWENHARDT, SUSAN R. LOEWEN-HARDT, GERALD F. LONERGAN, AGNES J. LONERGAN, JOYCE A. M. LORIMER, HILTON J. LUI, LAURA M. LUI, DENNIS H. Y. LUM, SYLVIA K. LUM, HENRY L. McCAL-LUM, MARJORIE E. McCALLUM, SALOM J. H. McILRATH, CHARLES M. MAEDA, BARBARA K. MAEDA, THOMAS K. MAKAOI, MILDRED A. K. MAKAOI, VINCENTE C. MAR-TINEZ, GRACE S. MARTINEZ, MASATOSHI P. MATSUI, MAE M. MATSUI, ROBERT K. MATSUNAKA, HELEN M. MATSUNAKA, BERTRAM T. MATSUNOBU, BETTY Y. MATSUNOBU, JOY RAE MEDEIROS, SAMSON L. MERCA-DO, DOROTHY L. MERCADO, ROY A. MINATO, MAR-

58

JORIE T. MINATO, CARL H. MITO, PHYLLIS K. MITO, RICHARD I. MITOBE, JEANNETTE E. MITOBE, CALVIN M. MIURA, BETH S. MIURA, GARY T. MIYAHARA, JOANNIE M. MIYAHARA, HENRY H. MIYAMOTO, MERLE S. MIYAMOTO, CLEMENT MONDOY, PATRICIA A. MONDOY, DOUGLAS J. MONIZ, ELAINE N. MONIZ, TAKIO MURAKAMI, NOBUKO MURAKAMI, ROY H. MURAMOTO, KAREN K. MURAMOTO, MELVYN M. MURAOKA, MARILYN H. MURAOKA, GEORGE M. NAKAMA, GRACE K. NAKAMA, HARRY Y. NAKAMA, PATSY T. NAKAMA, SHIGEKI NAKAMOTO, FLORENCE K. NAKAMOTO, SUSAN S. NAKAMOTO, FRANK K. NAKAMURA, CLARA M. NAKAMURA, PAUL H. NAKANELUA, JR., BARBARA J. NAKANELUA, THOMAS S. NAKASHIMA, HELEN M. NAKASHIMA, RICHARD Y. NAKASONE, SCARLETT S. NAKASONE, GERALD P. NAUGHTON, JUNE C. NAUGHTON, ROBERT A. NISHI, ROSEMARY Y. NISHI, DONALD M. NISHIIYE, JOYCE A. NISHIIYE, GEORGE M. NOJIRI, JUNEDALE K. NOJIRI, NELSON M. NOMI, BEVERLY K. S. NOMI, HERBERT M. NOUCHI, CAROL A. NOUCHI, RICHARD S. NUSHIDA, SHERRY S. NUSHIDA, JEUN ODA, JUDITH H. ODA, CLIFFORD R. O'DONNELL, BARBARA O'DONNELL, AKIRA OGATA, MUTSUE L. OGATA, TOKIO OGAWA, AKIKO OGAWA, RICHARD T. OHTA, BARBARA K. OHTA, OWEN OKUMURA, MARION K. OKUMURA, CLIFTON T. ONAGA, ELLEN M. ONAGA, WALLACE T. ONUMA, JANE K. ONUMA, RAYMOND S. OSHIRO, CAROL M. OSHIRO, DEL A. OSMAN, KAY F. OSMAN, SUENO OTA, WAYNE S. OTAKE, JEAN H. OTAKE, VIVIAN Y. OZAKI, GARET P. PAI, SYLVIA E. PAI, SAVIO W. H. PANG, CARESSA Y. M. PANG, ALFONSO J. PASION, GRACE H. PASION, TIM L. POELL, LAURA W. POELL, RONALD PORTO, BRENDA L. PORTO, ROBERT J. PROCTOR, ARDITH J. V. PROCTOR, SYED A. RAHIM, MAJEDA RAHIM, PATRICIA J. REILLY, MANUEL G. REZENTES, JR., YVONNE A. REZENTES, RALPH S. SAITO, JEAN K. SAITO, HIDEKO SAKAMOTO, THOMAS S. SAKATA, HIDEKO SAKATA, HORACE N. SASAKI, EMMA N. SASAKI, ROSALINE M. SASAKI, ROY S. SASAKI, LAURA N. SASAKI, GLENN K. SATO, DONNA M. SATO,

HARRY H. SATO, TERRY T. SATO, HARUO SATO, RICHARD C. SHARPE, DIANA M. SHARPE, YASUKO H. SHERIFF, RAYMOND H. SHIBATA, LILLIAN Y. SHIBATA, FRED H. SHIGEKANE, SHARON J. SHIGEKANE, MELVIN E. SHIGETA, JANE K. SHIGETA, TZU C. S. SHIH, TSUEN M. J. SHIH, FRANCIS M. SHITABATA, ELAINE A. SHITABATA, APOLONIO G. SINDIONG, JOAN M. SINDIONG, ARTHUR K. B. SIU, DAPHNE L. SIU, PETER C. SMITH, STEPHANIE S. SMITH, MELVIN M. SUEYOSHI, SHARON H. SUEYOSHI, MELVIN K. SUGIHARA, EVELYN C. SUGIHARA, SE MO SUH, YOUNG S. SUH, BRIAN N. SUNADA, LYNETTE C. SUNADA, TSUNEO SUNADA, ROSE H. SUNADA, MORIYO-SHI SUZUKI, YASUKO SUZUKI, ROBERT L. SWAN, PEARL L. SWAN, ALTON H. TAKAHASHI, PAMELA A. TAKAHA-SHI, HERBERT Y. TAKAYAMA, BEVERLY E. TAKAYAMA, JAY M. TANAKA, HAZEL M. TANAKA, KATSUKO H. TANG, ROLLAND F. TANG, SHIRLEY A. TANG, ROBERT EIICHI TERUYA, JUDITH S. TERUYA, ROBERT EISHO TERUYA, ALICE A. TERUYA, RONALD M. TOKITA, SALLY T. TOKI-TA, KURO R. TOMASA, CLARA K. U. TOMASA, FUJIO TOMITA, ELEANOR S. TOMITA, VELMA TONG, TOKIAKI TOYAMA, PATRICIA S. TOYAMA, KENNETH A. TSURUYA, MACHIKO TSURUYA, ALBERT H. TSUTSUI, PHYLLIS T. TSUTSUI, RALPH M. UEMAE, LILLIAN N. UEMAE, STE-VEN T. USUI, ELBERTA T. USUI, JORGE VARGAS, BERTHA R. VARGAS, LESLIE M. VICTOR, DORIS L. VICTOR, BAR-BARA O. VONNEGUT, GEORGE T. WADA, BETTY T. WADA, ROBIN L. WETZEL, WALTER K. W WONG, CHARLENE Y WONG, WALLACE T. YAMADA, SHARON R. YAMADA, JAMES T. YAMAGUCHI, LYNN M. YAMAGUCHI, HOWARD M. YAMAMOTO, FAYE B. YAMAMOTO, LEROY T. YAMA-MOTO, EVELYN S. YAMAMOTO, RAY K. YAMAMOTO, PAULINE H. YAMAMOTO, JANE T. YAMASHITA, ALLAN Y. YAMAUCHI, JANET M. YAMAUCHI, YOSHIO YOSHIDA, SETSUKO YOSHIDA, GARY T. YOSHITAKE, CAROLYNN S. YOSHITAKE, ALVIN K. Y. YOUNG, ESTHER K. K. H. YOUNG, WINSTON N. YOUNG, ELEANOR L. Q. YOUNG, SUNG C. YUE, and DOROTHY M. YUE, Defendants-Appellees, and JOHN DOES 1-10, MARY DOES 1-10, DOE PARTNER-

SHIPS 1-10, DOE CORPORATIONS 1-10, DOE "NON-PROFIT" CORPORATIONS 1-10, and DOE ENTITIES 1-10, Defendants

NO. 9706

(CIVIL NO. 63408)

JULY 29, 1985

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, JJ.,
AND INTERMEDIATE COURT OF APPEALS
ASSOCIATE JUDGE HARRY T. TANAKA IN PLACE OF
WAKATSUKI, J., DISQUALIFIED

62

OPINION OF THE COURT BY LUM, C.J.

This is an appeal from a judgment in condemnation proceedings involving residential leasehold lands brought by the Hawaii Housing Authority under Hawaii Revised Statutes, Chapter 516, a codification of the Hawaii Land Reform Act.[1] The Trustees of the Bernice Pauahi Bishop Estate, as Appellants, challenge the constitutionality of the Act on the grounds that it allows taking of their property for private rather than public use and that they were denied just compensation. Kaiser Hawaii-Kai Development Co., Kaiser Aetna and Kacor Realty, Inc., the property developers, separately appeal from the same judgment to the extent that it affects their contractual interest in the condemnation proceeds and from a later order denying a motion to alter or amend the judgment.[2] For the reasons set forth below, we affirm the rulings of the lower court.

I.

A.

The ancient Hawaiian land tenure system was essentially feudal in nature and devoid of the relatively modern concept of private property ownership. The pattern of land division paralleled the societal hierarchy so that authority and control over the land rested with a comparative

---

[1]The Hawaii Land Reform Act, codified at Hawaii Revised Statutes, Chapter 516, was first adopted as Act 307, 1967 Haw. Sess. Laws 488. The Act thereafter was amended by Act 46 in 1968, Act 203 in 1969, Act 215 in 1971, Acts 2 and 107 in 1972, Acts 184 and 186 in 1975, Acts 159 and 242 in 1976, Act 140 in 1978, Act 227 in 1979, Acts 39 and 107 in 1980, Acts 203, 204 and 270 in 1983, and Acts 89, 157 and 162 in 1984.

[2]The appeals were consolidated for purposes of our review.

few.[3] Beginning in the 1800's, efforts were made to adjust land rights to new relationships and dependencies largely brought about by western influences. While dramatic land divisions were effectuated and a system of fee simple ownership instituted, for a number of socio-economic reasons land remained vested in a minority. *See generally* J. Chinen, *The Great Mahele* (1958); Levy, *Native Hawaiian Land Rights,* 63 Calif. L. Rev. 848 (1975).

This disproportional concentration of land ownership continues today. After a comprehensive investigation, the legislature determined that at least three-fourths of all the privately held land in the state is currently owned by a small group of estates, trusts, and private landowners, some of whom have chosen to lease their land for residential use rather than to sell it. Act 307, § 1, 1967 Haw. Sess. Laws 488, 489.[4] In extensive findings, the legislature concluded that this concentrated land ownership was responsible for skewing the state's residential fee simple

---

[3] All lands were vested in the sovereign who distributed large portions of the principal chiefs who in turn granted control of more limited acreage to subordinate subchiefs and land agents; on the lowest rung, commoner tenants were permitted to work the land. *Kalipi v. Hawaiian Trust Co.,* 66 Haw. 1, 6-7, 656 P.2d 745, 749 (1982); Levy, *Native Hawaiian Land Rights,* 63 Calif. L. Rev. 848, 849 (1975). Each in his turn derived benefits in the form of goods and services but ultimately held his interest in land at the will of the sovereign or superior, subject always to dispossession and redivision. *Id.; see also In re Estate of His Majesty Kamehameha IV,* 2 Haw. 715, 718-19 (1864).

[4] Hearings relating to subsequent amendments to Act 307 yielded similar information which were made part of the legislative findings. For example, in 1975 the legislature found:

(a) The fee simple ownership of residential lands in the State is still concentrated in the hands of a small number of landowners. The state and federal governments and the largest 72 private landowners own approximately 95 per cent of all land area within the State. On Oahu alone, 22 major private landowners own 72.5 per cent of all land.

(b) The small number of landowners have continued to follow the policy of not selling their land for residential use but of leasing their lands under long-term residential leases. While fee simple ownership still accounted for 68.9 per cent of all owner-occupied housing on Oahu in 1972, leasehold residential development has dominated the housing market since 1967 as it had during the period 1950 to 1967. Between 1950 and 1966, 40 per cent of all owner-occupied housing units developed on Oahu had been on leasehold. Between 1967 and 1972, 46 per cent of such development has been on leaseholds. In 1973, leaseholds constituted 32 per cent of all owner-occupied housing, more than double the percentage in 1960.

Act 184, § 1, 1975 Haw. Sess. Laws 408, 408.

market, inflating land prices, and injuring the public welfare.[5]

To remedy these problems, the legislature in 1967 enacted the Hawaii Land Reform Act, HRS Chapter 516 (hereinafter the Act), providing for the condemnation and subsequent transfer of the residential fee interest to the lessee. Its stated intent is to increase the availability, alienability and turnover of single family residential lots, spread ownership of fees simple, disperse the oligopolistic market power of the large landowners, and stabilize land prices, inflation, and the state's economy by containing the cost of living and the cost of public assistance. See HRS § 516-83; Act 307, § 1, 1967 Haw. Sess. Laws at 488-90.

Under the Act's condemnation scheme, any lessee of a single family houselot of no more than two acres within a development tract of at least five acres may apply to the Hawaii Housing Authority (hereinafter the HHA) to condemn the underlying fee interest. An eligible tenant is one who, among other things, owns or has an equitable interest in the residential structure on the lot, is a state resident or intends to live on the lot, shows proof of ability to pay the HHA for a fee interest, and does not own fee simple residential land elsewhere nearby. HRS § 516-33 (1976 & Supp. 1984). When twenty-five eligible tenants or lessees of half

---

[5]The legislature found:

(f) The population growth and the increase in demand for residential lots, and the concentration of ownership of private lands in the hands of a few and their practice of leasing, rather than selling in fee simple, the residential lots developed on their lands, have led to a serious shortage of residential fee simple property at reasonable prices in the State's urban areas and have deprived the people of the State of a choice to own or to take leases to the land on which their homes are situated.

(g) The shortage of single-family, residential, fee simple property, and the restriction on the people of a real choice between fee simple and leasehold residential property have in turn caused land prices for both fee simple and leasehold residential lots to become artificially inflated and have enabled lessors to include in residential leases terms and conditions that are financially disadvantageous to the lessees, restrict unduly their freedom to enjoy their leasehold estates and are weighted heavily in favor of the landlord as against the lessees.

. . . .

(j) The dispersion of ownership of fee simple residential lots to as large a number of people as possible, the ability of the people to acquire fee simple ownership of residential lots at a fair and reasonable price and the ability to lessees of residential leases to derive full enjoyment from their leaseholds are factors which vitally affect the economy of the State and the public interest, health, welfare, security and happiness. Act 307, § 1, 1967 Haw. Sess. Laws at 489, 490. Similar findings can be found in Act 186, § 2, 1976 Haw. Sess. Laws 423, 424-27 (codified at HRS § 516-83 (1976)) and in Act 184, § 1, 1975 Haw. Sess. Laws at 408-09.

of the lots in the tract file appropriate applications, the HHA, after public notice and hearing, may designate some or all of the lots in the tract for acquisition by eminent domain or purchase under threat of eminent domain if it finds that the acquisition will effectuate the public purposes of the Act. HRS § 516-22 (1976). The HHA then acquires the fee interest in the designated lots either by eminent domain proceedings pursuant to HRS Chapter 101 or by negotiations between the parties. HRS §§ 516-23, -25 (1976). In either case, compensation must equal the fair market value of the owner's leased fee interest. HRS §§ 516-1(14), -24 (Supp. 1984).

After acquiring title, the HHA may sell the land titles to qualified tenant applicants. HRS § 516-30 (1976). It may lend up to ninety per cent of the purchase price subject to certain restrictions including the right of first refusal if the borrower resells within ten years. HRS §§ 516-34, -35 (1976). If the HHA does not sell the acquired fee to the lessee, it may lease the lot or sell it to another, however it may not sell or lease more than one lot to any one purchaser or tenant. HRS § 516-28 (1976). While the Act authorizes the issuance of general obligation bonds for purposes of acquisition, HRS § 516-45 (1976), to date this has not occurred.

### B.

The instant appeal arises from the application of the Act to 257 leased lots in the Kamiloiki Valley Subdivision in Hawaii Kai, Oahu. The lessees of those lots had applied to the HHA for purchase of the underlying fee interest. When it was determined that at least 25 of the lessee applicants were eligible, the HHA, on January 18, 1979, adopted a resolution proposing designation of 254 lots for acquisition. On March 30, 1979, after notice and hearing, the HHA determined that the public purpose of the Act would be effectuated by the taking and designated the lots for acquisition.[6]

Negotiations to fix compensation failed and, on November 10, 1980, the HHA filed a complaint for condemnation against the Trustees of the Bernice Pauahi Bishop Estate (hereinafter the Trustees), the owner of

---

[6]The HHA subsequently designated three additional houselots, bringing the total number to 257.

the property.[7] Homeowner lessees were also named as parties to the action. The subdivision developers, Kaiser Hawaii-Kai Development Co., Kaiser Aetna and Kacor Realty, Inc. (hereinafter collectively Kaiser), were also named as defendants. As will be detailed *infra,* Kaiser filed a cross-claim, however the parties agreed to a separate hearing on this matter.

A five week jury trial was held in September 1982 to determine the value of the Trustees' leased fee interest in the Kamiloiki lots. The verdict assigning a value considerably less than that sought by the Trustees was filed in open court on November 3, 1982.

A bench trial to determine whether the taking was for a "public use" under the United States and Hawaii Constitutions was held on March 14, 1983 to June 6, 1983. The proceeding was necessitated by this court's opinion in *Hawaii Housing Authority v. Castle,* 65 Haw. 465, 653 P.2d 781 (1982), reversing the lower court's summary judgment finding the Act constitutional and remanding for evidentiary hearings on the public use issue. Meanwhile, in *Midkiff v. Tom,* 702 F.2d 788 (9th Cir. 1983), a separate federal case brought by the Trustees, the Ninth Circuit declared the Act unconstitutional, but the trial of the instant case continued to conclusion with the trial court upholding the Act's constitutionality.

Findings of Fact and Conclusions of Law were filed on September 6, 1983 and Judgment incorporating the verdict of the "valuation" trial was entered on September 29, 1983. The judgment was silent as to the rights of Kaiser. Motions to alter or amend the judgment and to amend the court's findings and conclusion were denied on December 29, 1983, and the Trustees and Kaiser timely filed separate appeals on January 27, 1984.

Subsequently, the United States Supreme Court reversed the Ninth Circuit and upheld the Act as against the Trustees' "public use" challenge under the U.S. Constitution. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S. Ct. 2321 (1984).

---

[7]Trustees' interest derives from the will of Princess Bernice Pauahi Bishop establishing a perpetual trust for the education of Native Hawaiians. The corpus of the trust is lands owned by the Princess. Trust lands comprise about 8% of the land area in the State and 15.1% of the lands on Oahu; about 2% of its total holdings are devoted to residential leaseholds. The estate owns 19.6% of Oahu residential land and 24.43% of that island's unimproved residential land

II.

We consider first the issue of whether the Hawaii Land Reform Act violates the "public use" requirement of article I, section 20 of the Hawaii Constitution.[8] The Trustees contend the Act is a thinly veiled attempt to divest large private landowners without an appreciable public benefit and, as such, permits the unconstitutional exercise of the state's condemnation powers for primarily private rather than public use. Under the applicable standards we disagree and conclude that the Act passes the scrutiny of the public use clause.

Article I, section 20, vests the state with the right of eminent domain empowering it to take private property for public use upon payment of just compensation, but the provision may not be read to justify expropriation for a strictly private use or purpose. *Cf. Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 80 (1937). *See generally* 29A C.J.S. *Eminent Domain* § 29 (1965). Legislative enactments authorizing such takings cannot pass constitutional muster and must be struck down.

However, the role of the courts in making this determination is necessarily limited by the separation of powers between the legislative and judicial branches. *Hawaii Housing Authority v. Schnack,* 39 Haw. 543, 549 (1952); *Hawaii Housing Authority v. Midkiff, supra,* at 2329. In the case at bar, the Hawaii Legislature determined that disproportional concentrations of residential landholdings exist to the public detriment and that use of the sovereign's eminent domain powers to realign ownership patterns was for the public benefit, and therefore, a "public use". Accordingly, our inquiry must center upon the extent to which we may examine these declarations to determine whether in fact a public use exists and would be furthered by operation of the statute.

A.

The United States Supreme Court's opinion in *Hawaii Housing Authority v. Midkiff, supra,* involving the propriety of the Act under the fifth amendment to the United States Constitution, is obviously relevant

---

[8]The provision reads, "[p]rivate property shall not be taken or damaged for public use without just compensation." Haw. Const. art. I, § 20.

to our discussion.[9] There, the Court unanimously upheld the Act's constitutionality on public use grounds.[10] It determined that the power of eminent domain, like the police power, is merely a means through which legislative authority may be exercised to serve the public welfare. As long as the object to be accomplished is within the legislature's authority, it is empowered to select the vehicle to achieve that end and, having done so, the public interest has been declared in well-nigh conclusive terms; the fact that eminent domain is involved is irrelevant. *Id.* at 2328-29. Thus, the Court, relying on *Berman v. Parker,* 348 U.S. 26 (1954), broadly held that the public use clause is "coterminous with the scope of a sovereign's police powers." *Id.* at 2329. The Hawaii Legislature's attempt to regulate oligopoly and its concomitant evils is a classic exercise of these powers. *Id.* at 2330.

The Court did recognize a role for judicial review of a legislature's public use determination but, because of the dangers of unwarranted invasions of the legislative function, it is an extremely limited one. *Id.* at 2329. Courts will not substitute their judgment for the legislature's judgment as to what constitutes a public use "unless the use be palpably without reasonable foundation." *Id.,* quoting *United States v. Gettysburg Electric Railway Co.,* 160 U.S. 668, 680 (1896). The Supreme Court thus reaffirmed a minimum rationality standard of review to be applied by federal courts in evaluating legislative findings of public use. Where the exercise of the eminent domain power is rationally related to a conceivable public purpose, a compensated taking is not proscribed by the public use clause. *Id.*

The Court emphasized that inquiries into whether the provision will accomplish its objective are not to be indulged, the test being whether the legislature rationally could have believed that the Act would promote its objective. *Id.* at 2330. Thus, "[w]hen the legislature's purpose is legitimate and its means are not irrational, . . . empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socioeconomic legislation—are not to be carried out in the federal courts." *Id.*

Under this standard, the Court concluded that use of the eminent domain power to redistribute private fee simple interests was a rational

---

[9]For a further analysis of the opinion, *see* Note, *Midkiff v. Tom: The Constitutionality of Hawaii's Land Reform Act,* 6 U. Haw L. Rev 561, 601 add. (1984).

[10]The Court did not reach the issue of just compensation. 104 S. Ct. at 2326 n. 2.

approach to achieving the legitimate public purpose of correcting problems which the legislature attributed to an oligopolistic land market. *Id.* It upheld the legislative public use determination and concluded that the Act passed scrutiny of the federal public use clause. *Id.*

B.

When enacted, article I, section 20 of the Hawaii Constitution was identical to the fifth amendment to the United States Constitution and was adopted because of the certainty given to the interpretation of the section by the federal decisions. Committee of the Whole Report No. 5, in 1 Proceedings of the Constitutional Convention of Hawaii 1950 at 304 (1960).[11] The two sections remain substantially similar.[12] Consequently, the United States Supreme Court's interpretation of the federal public use clause as it applies to the Land Reform Act is persuasive authority for our review of the Hawaii constitutional provision.

However, we are not precluded from interpreting our state constitution to afford greater protection than that required by federal constitutional interpretations and have not hesitated to do so where warranted by logic and due regard for the purposes of those protections. *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974); *State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967). We decline in this instance to embrace the Court's broader ruling in *Hawaii Housing Authority v. Midkiff, supra,* equating the public use requirement of eminent domain with the state's police power. Rather, our review is limited to an examination of the Act's constitutionality under the minimum rationality standard, which we adopt as appropriate for judicial evaluation of the legislature's public use determinations.

We have traditionally favored a policy of deference to legislative conclusions of public use because of the "high regard which the courts

---

[11]The provision was adopted by a vote of the people of Hawaii in 1950 and ratified by the United States Congress upon Hawaii's admission to statehood in 1959.

[12]The fifth amendment to the United States Constitution provides in pertinent part, "nor shall property be taken for public use, without just compensation." The Hawaii provision differs only insofar as it provides that "property shall not be taken or damaged . . . ." The "or damaged" language was added by the Hawaii Constitutional Convention of 1968 to bring our eminent domain provision in line with that of twenty-five other states. Stand. Comm. Rep. No. 55 (Majority), in 1 Proceedings of the Constitutional Convention of Hawaii of 1968 at 235 (1973).

[must] have for . . . a decision of a co-ordinate department of the government on a matter within its knowledge and duty." *Hawaii Housing Authority v. Schnack,* 39 Haw. 543, 549 (1952); *see also Hawaii Housing v. Midkiff, supra,* at 2329. As the state legislature has primary authority for the exercise of the state's right of eminent domain, *Territory v. Aona,* 43 Haw. 253, 255-56 (1959); 29A C.J.S. *Eminent Domain* § 19, questions concerning the nature of the proposed use are, in the first instance, for the legislature to decide. *Hawaii Housing Authority v Schnack, supra,* at 549; 29A C.J.S. *Eminent Domain* § 30.

Designation of the types of activities to which condemned property is to be applied is a legislative declaration that such use is public, creating a judicial presumption of public use. *Territory v. Aona, supra,* at 257; *Hawaii Housing Authority v. Schnack, supra,* at 549; 29A C.J.S. *Eminent Domain* § 30. Where the legislature has gone further by promulgating specific findings and declarations of public use, these are entitled to great weight, indeed, to a prima facie acceptance of their correctness. *Hawaii Housing v. Schnack, supra,* at 549.

Under these priciples, courts are bound by the legislature's public use determination unless such use is clearly and palpably of a private character. *Id.* at 550; *State v. Anderson,* 56 Haw. 566, 574, 545 P.2d 1175, 1180-81 (1976) (deciding whether exercise of the State tax power was for a public purpose). As specified in *Hawaii Housing Authority v. Schnack:*

> [This] does not mean that either the decision of the legislature or the presumption is conclusive, for the issue of public use is a judicial question and one of law to be decided on the facts and circumstances of each particular case. Nevertheless, the great weight accorded to the legislative finding and the prima facie acceptance of its correctness, as well as the binding effect of the presumption, demonstrates that the courts will not lightly disturb such a finding and will not overrule it unless it is manifestly wrong.

39 Haw. at 550. The courts will not invade the legislative province unless, under the above principles, a clearly private taking is demonstrated.

We therefore hold that once the legislature has spoken on the social issue involved, so long as the exercise of the eminent domain power is rationally related to the objective sought, the legislative public use declaration should be upheld unless it is palpably without reasonable foundation. The crucial inquiry is whether the legislature might reason-

ably consider the use public, *id.* at 549, and whether it rationally could have believed that application of the sovereign's condemnation powers would accomplish the public use goal. *Hawaii Housing Authority v. Midkiff, supra,* at 2330.

The Hawaii Legislature, in comprehensive findings, determined that skewed patterns of land ownership have interfered with the normal functioning of the state's residential land market and declared that condemnation of certain concentrated private property interests would serve a public use by correcting the perceived social and economic evils of a land oligopoly. Clearly, the legislature reasonably could have believed that condemnation and resale of the fee interest in leasehold land would promote the objectives of increasing the availability of residential property, realigning the residential fee simple market, reducing land prices, and would beneficially impact the state economy and general public welfare.

These are legitimate public purposes. The employment of the state's eminent domain authority to redistribute fees simple to correct socio-economic problems attributed to the legislature to a land oligopoly is a rational means to accomplish these ends.

Manifest error in declaring that the Act's objectives are of a public rather than clearly private nature is not shown. We are mindful that a taking which provides private lessees with fee simple title is a non-traditional exercise of eminent domain but novelty is not a deterrent. *Territory v. Aona, supra,* at 258. The mere fact that property condemned by the state is transferred in the first instance to private beneficiaries does not characterize the taking as strictly private. *Hawaii Housing Authority v. Midkiff, supra,* at 2331. If some conceivable public benefit may be realized, what is outwardly only a private transaction may be raised to a public affair. *Id.* The Hawaii Land Reform Act was designed to rectify a problem of public dimensions; it is not palpably without reasonable foundation.

Every enactment of the legislature carries a presumption of constitutionality and must be judicially affirmed unless it has been shown beyond all reasonable doubt to be in violation of the constitution. *City & County of Honolulu v. Ariyoshi,* 67 Haw. 412, ___, 689 P.2d 757, 763 (1984). Under the above articulated standard, the Trustees have failed to meet this burden. Accordingly, we defer to the state legislature's public use determination and uphold the constitutionality of the Act under the

72

public use clause.[13]

### III.

The Trustees further contend they were denied "just compensation," as required by the federal and state constitutions, for their interests in the condemned parcels. They argue, first, that the provisions of the Act governing the manner by which their interests are valued do not provide compensation sufficient to meet the constitutional standards. Second, they argue that certain procedural and evidentiary rulings made by the trial court resulted in their receiving less than just compensation. Finally, they argue that the trial court's decision that interest on the compensation awarded—also known as "blight of summons" damages —must be limited to the rate of five percent, deprives them of just compensation.

### A

The Act provides for the condemnation of the "leased fee interests" in the houselots, and "leased fee interest" is defined as "all of the interests of the fee owner, lessor and all legal and equitable owners of the land which is leased, other than the lessee's interest as defined by this chapter." HRS § 516-1(6) (1976). The Act further provides that "[t]he compensation to be paid for the leased fee interest . . . shall be the owner's basis as defined in section 516-1(14)," HRS § 516-24 (Supp. 1984), and " '[o]wner's basis' means the value of the lessor's leased fee interest in the lot that would apply if such interests were normally traded on an open market. The fair market value of the owner's basis shall be established to provide the lessor with just compensation for his interest in the lot and shall take into consideration every interest and equity of the lessee in establishing that market value." HRS § 516-1(14) (Supp. 1984). Section 516-1(14) goes on to state that the value of the leased fee interest may be determined by either of two specified methods or by "any other method which is normally used by qualified appraisers in establishing the fair market value of a lessor's leased fee interest in land."

---

[13]Numerous procedural issues were raised during the "public use" trial. On review of the record, we find the Trustees' allegations of error to be without merit.

The Trustees have not demonstrated that these statutory provisions deprive them of just compensation. They fail to show that their interest in the land is greater than the "leased fee interest" as defined in the Act. With regard to valuation methods, neither party attempted to use either of the two methods specified in § 516-1(14), therefore we need not decide whether those methods would have provided just compensation. Both parties presented expert valuation testimony utilizing "other method[s] . . . normally used by qualified appraisers in establishing the fair market value of a lessor's leased fee interest in land." The Trustees do not contend that they were prevented from introducing valuation evidence according to the method of their choice, nor do they contend that the methods employed by the opposing valuation experts were improper. In short, there is simply no basis for finding that the statutory scheme fails to provide just compensation.

### B.

The Trustees contend that the Lessees should not have been a party to this action and that it was wrong for the HHA to "delegate control" of the valuation portion of the trial to the Lessees. More specifically, the Trustees argue that the HHA had an obligation to present evidence of the value of the interests being taken, and this obligation was not fulfilled where the HHA failed to present valuation evidence from its own experts but rather relied on the testimony of experts hired by the Lessees.

In 1983 the legislature amended the Act to make explicit that the lessees shall be a party to proceedings under the Act and that they must be given the opportunity to present valuation evidence. HRS § 516-56 (Supp. 1984). This case, however, was tried prior to this amendment to the Act. The issue, therefore, is whether it was proper for the trial court to permit the Lessees to appear as parties in the absence of the express provision of § 516-56. HRS § 101-21 (1976), which applies to eminent domain proceedings generally, says that:

> Any person in occupation of or having any claim or interest in any property sought to be condemned or in the damages for the taking thereof though not named in the complaint, may appear, plead, and defend in respect to his own property or interest, in like manner as if named in the complaint.

Thus we find it was well within the trial court's discretion to allow the Lessees to appear as parties herein.

Inasmuch as they were proper parties, the trial court did not err by allowing the Lessees to take an active role in the presentation of the case. Although the HHA had the burden of presenting valuation evidence, it was not required to do so independently from the Lessees. The testimony of the Lessees' appraiser was competent and reasonable, and it was within the trial court's discretion to allow the HHA to meet its burden in this manner.

The Trustees complain that the trial court erred in admitting the testimony of Attorney Bernard Bays, who had represented another group of lessees in negotiations with the Trustees for the sale of houselots. The Trustees had introduced evidence of those negotiated sales as "comparables," to prove the value of the houselots being condemned in this action. The Lessees called Mr. Bays as a rebuttal witness in an attempt to show that those negotiated sales involved an element of compulsion or coercion and therefore did not reflect true market value. Such evidence was relevant and the trial court did not abuse its discretion in admitting it.

Finally, the Trustees complain that the trial court erred in refusing to admit into evidence an appraisal report which had been prepared in 1978 at the request of the Lessees' association for use in pre-trial negotiations with the Trustees. The report concluded that the values of the lots were significantly greater than the values presented by the Lessees' appraiser at trial, and the Trustees therefore wanted to introduce the report to show that the values presented by the Lessees at trial were unreasonably low. The trial court admitted portions of the report over the Lessees' objections, including the methodology used, the comparables used, the appreciation rate, and even the fact that the final values reported were multiples higher than those presented by the Lessees' appraiser at trial. The Trustees argue that it was error for the trial court to refuse to admit *all* of the report.

The legislature amended § 516-51 in 1983 and 1984 so as to make such an appraisal report undiscoverable and inadmissible in any action brought under the Act. But even prior to this legislative action, we had held that a party to condemnation proceedings does not necessarily have a right to introduce appraisal evidence prepared by an opposing party. In *City & County of Honolulu v. Bonded Investment Co.,* 54 Haw. 385, 507 P.2d 1084 (1973), the condemnees wanted to call two expert appraisers to testify on the subject of market value. These appraisers had been hired by the City & County during the preparation of the case, but they

were not called to testify by the City & County. We noted that these appraisers

> possessed no unique knowledge with regard to the instant case as would an eyewitness of an automobile accident. Condemnees were seeking expert testimony on the subject of fair market value favorable to them. This could be acquired by hiring their own expert appraisers. Further, there was no showing of good cause why the City's experts should have been called rather than any others. Condemnees have not shown the unavailability of other competent expert appraisers in this case. Therefore, as a matter of fairness, and in the absence of good cause, the trial court, in its discretion, correctly disallowed condemnees from using the City's expert appraisers.

*Id.* at 391, 507 P.2d at 1089.

Accordingly, we find that the trial court acted within the limits of its discretion in ruling that the report was at least partially inadmissible by the Trustees.

### C.

The Trustees filed a motion prior to trial in which they asked the court to rule that they should be allowed to present evidence to establish the appropriate interest rate and compounding period to be used in computing damages for the delay in payment of the condemnation award from the date of designation until the date full payment is received. After a hearing on the motion on September 20, 1982, the court filed an order on October 19, 1982, denying the motion. In effect, the court ruled that any such interest must be paid at the rate of five percent, pursuant to HRS §§ 101-25 and 101-33, and our decision in *City & County of Honolulu v. Bonded Investment Co., supra.* The Trustees now attempt to appeal that order, arguing that the limitation of such interest to five percent is a denial of their constitutional right to just compensation. We are reluctant, however, to decide this question at the present time, given the state of the record before us.

This appeal was taken from a judgment entered on September 29, 1983, which was certified for review pursuant to HRCP Rule 54(b). That judgment lists the value of the "leased fee interest" for each of the lots being condemned, but makes no provision for any award of interest. It was evidently contemplated by the trial court that an award of interest on the amounts listed in the judgment appealed from, would be made

after the disposition of this appeal. Although it might nevertheless be possible for us to review at this time the decision of the trial court that any interest awarded will be limited to five percent, we decline the invitation. We think it preferable that an appellate court decide that issue on a record that includes a complete treatment of the blight of summons issue. We therefore reserve our decision on this issue until such time as it is properly presented on appeal.

## IV.

Defendants Kaiser Hawaii-Kai Development Co., Kaiser Aetna and Kacor Realty, Inc., (hereinafter collectively Kaiser) appeal from the judgment entered September 29, 1983. Kaiser was named as a Defendant in the eminent domain action initiated by the HHA along with the Trustees, the complaint seeking resolution of all claims to the subject property and to the compensation and damages awarded. Kaiser cross-claimed against the Trustees for a share of the condemnation award. Kaiser had acted as developer of the Kamiloiki tract, and pursuant to the terms of its development agreement with the Trustees, Kaiser alleged that it was entitled to a portion of any such proceeds.

Before trial, the parties and the judge agreed in chambers to separate Kaiser's cross-claim from the condemnation proceeding on public use and valuation. The Order appealed from holds that the taking is for a public use and assigns values to the individual lots. It states that there is no just reason for delay and directs entry of judgment on these issues.[14]

Kaiser asserts that the failure of the trial court to rule on its cross-claim against the Trustees rendered the judgment on valuation partial, and therefore not appealable. Our review of the record convinces us, however, that the trial court committed no error in certifying its judgment.

Kaiser's argument flies in the face of a plain reading of HRCP Rule 54(b), which provides:

> (b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counter-claim, cross-claim, or third-party claim, or when multiple parties are involved, *the court may direct the entry*

---

[14]While not specifically referring to HRCP Rule 54(b), the express determinations recited in the Order track the language of that Rule's requirements.

*of a final judgment as to one or more but fewer than all of the claims or parties* only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. (Emphasis added.)

The fact that no ruling was made on the cross-claim, therefore, is entirely within the contemplation of the rule, with its language directing judgment as to "fewer than all of the claims."

It is true, as Kaiser points out, that while HRCP Rule 54(b) permits the entry of judgment on one of several claims, the claim itself must be fully adjudicated. Kaiser alleges that the valuation judgment is merely partial, because it leaves open the issues of who will be liable to pay the condemnation award, the parties to whom it must be paid and when it will be paid. Kaiser's entitlement to a portion of the proceeds was also not determined.

As the HHA notes, however, the first three of these elements are dictated by statute. The statute, in HRS § 516-23 (1976) references the statutory eminent domain sections, which provide for payment by the plaintiff. HRS § 101-25 (1976). The Land Reform Act section on compensation itself refers to "compensation paid by the Hawaii housing authority." HRS § 516-26 (1976). Regardless of the HHA's ultimate source for these funds, by statute the HHA as plaintiff-condemnor will be the party bearing liability, if any, for the award.

Similarly, the statute provides for the identity of the recipient of the award:

*Interest in compensation paid by the authority.* The fee owner, lessor, and all legal and equitable owners shall share in the compensation paid by the Hawaii housing authority as their respective interests appear. Notwithstanding any contrary provision in any contract or lease, a developer or other person entitled to share in the lease rentals shall share in such compensation paid by the authority to the extent of his interest as may be determined by agreement of those entitled to share in the compensation paid by the authority, or in the absence of such agreement, pursuant to chapter 658.

HRS § 516-26 (1976).

Kaiser's rights to any proceeds of the award necessarily derive from those of the Trustees, since such rights, if they do exist, stem from the development agreement contract. Kaiser does not assert an equitable interest in the subject parcels, but its rights pursuant to this document. Therefore, while the Trustees may ultimately be liable to Kaiser pursu-

ant to that agreement, a judgment naming the Trustees is not partial. It merely signifies that the rights of the Trustees and Kaiser *inter se* will have to be resolved later.

Finally, the time of payment is provided for by statute. HRS § 101-25 (1976) provides for payment within two years after final judgment.

Similarly, the judgment is not partial although it leaves unresolved the apportionment between Kaiser and the Trustees. Kaiser's rights to such proceeds, if any, will derive from the development agreement. Nothing in the judgment as entered bars a court from undertaking construction and interpretation of that agreement. The trial court could grant a Rule 54(b) motion to enter final judgment on the Trustees' condemnation award while a cross-claim considering the Trustees' duty to pay Kaiser a share was pending. The cross-claim remains Kaiser's vehicle for determining its share of the award.

In addition, we find no merit in Kaiser's allegation that the trial court abused its discretion in granting the Rule 54(b) certification. The trial court is vested with discretion to certify a claim under Rule 54(b) after weighing the advantage of expedited appeal against the potential for waste of judicial resources and equitable arguments for delay. *Curtiss-Wright Corp. v. General Electric Co.,* 446 U.S. 1, 8, 10 (1980). While the court may not certify a non-final claim, it may in its discretion certify fewer than all claims in a multiple claims or parties situation. *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437 (1956).

This discretion was not abused in this case. Notwithstanding Kaiser's arguments, additional piecemeal litigation would not result from certification, since the Trustee/Kaiser claim was an entirely separate matter from the merits of the valuation claim. The agreement of the parties in a sense contemplated adjudication in pieces, since the cross-claim was bifurcated from the valuation proceeding. Its resolution would turn not on the issues raised at the valuation proceeding, but upon interpretation of the development agreement.

Kaiser's argument that the trial court erred in not considering its interest in the litigation is fallacious. By its own representation made by counsel in chambers, Kaiser had no interest in participating in the valuation portion of the proceeding. Similarly, Kaiser's attack on the certification procedure is unavailing. The court's power to certify such a claim under Rule 54(b) may be invoked on motion of a party, by agreement of the parties, or by the trial court, which by virtue of the discretion vested in it may execute or decide not to execute a certificate

on its own motion. 6 *Moore's Federal Practice,* ¶ 54.41[3] at 742-43 (2nd ed. 1976).

## V.

As against the Trustees' challenge, we uphold the constitutionality of the Hawaii Land Reform Act under the public use and just compensation clauses of article I, section 20 of the Hawaii Constitution and the just compensation clause of the fifth amendment to the United States Constitution. Appellant Kaiser's appeal concerning alleged errors in the lower court's condemnation award is dismissed as being without merit.

The judgment of the trial court is affirmed.

*Clinton R. Ashford* (*Wayne Nasser, Rosemary T. Fazio* and *Paul S. Aoki* with him on the briefs; *Ashford & Wriston,* of counsel) for Appellants Trustees.

*Michael A. Lilly,* Attorney General, (*Sonia Faust, Terrence Yamamoto, Peter L. Yee,* Deputy Attorneys General, with him on the answering brief filed on 1/3/85) for Appellee Hawaii Housing Authority.

*Dennis E. W. O'Connor* (*Jerrold K. Guben* and *Theodore Y. Uyeno* with him on the briefs; Hoddick, Reinwald, O'Connor & Marrack, of counsel) for Appellees Lessees.

On the Briefs:

*R. Charles Bocken* and *Heidi M. Rian* (*Damon, Key, Char & Bocken,* of counsel) for Appellants Kaiser Hawaii-Kai Development Co., Kaiser Aetna and Kacor Realty, Inc.

*Daniel H. Case* and *James M. Cribley* (*Case, Kay & Lynch,* of counsel) for amici curiae Queen Liliuokalani Trust, King Lunalilo Trust, Alu Like, Inc., and Association of Hawaiian Civic Clubs.

*H.K. Bruss Keppeler* for amicus curiae The Office of Hawaiian Affairs.