William S. RICHARDSON,
et al., Plaintiffs,

v.

CITY AND COUNTY OF HONOLULU,
Defendant,

and

Hale Coalition, Intervenor.

Civ. No. 91–00725 DAE.

United States District Court,
D. Hawaii.

Sept. 16, 1992.

Gail M. Tamashiro, Dennis J. Gaughan, Cades Schutte Fleming & Wright, C. Michael Hare, Cades Schutte Fleming & Wright, Honolulu, Hawaii, for plaintiffs.

Dennis E.W. O'Connor, Jerrold K. Guben, Reinwald O'Connor Marrack Hoskins & Playdon, Honolulu, Hawaii, for intervenor.

Ronald B. Mun, Thomas P. Rack, Deputy Corp. Counsel, Corp. Counsel City & County of Honolulu, Dale W. Lee, Bert T. Kobayashi, Jr., Lex R. Smith, Kobayashi Sugita & Goda, Honolulu, Hawaii, for defendant.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND CERTIFYING QUESTION TO HAWAII SUPREME COURT

DAVID ALAN EZRA, District Judge.

This court heard the parties' motions for summary judgment on August 10, 1992.

## BACKGROUND

On December 4, 1991, the City Council of defendant City and County of Honolulu[1] passed Bills 156 (1990) and 36 (1991) which were later enacted on December 18, 1991 as Ordinances 91–95 and 91–96, respectively. Ordinance 91–95 involves a mechanism for the transfer of the fee simple interest of leasehold property from condominium lessors to condominium lessees in Honolulu. Ordinance 91–96 imposes a ceiling on renegotiated lease rents for ground leases of owner-occupied residential condominium units in Honolulu.

On December 18, 1991, the date of enactment of the aforementioned ordinances, the plaintiff Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate ("Bishop Estate") filed the present action alleging that both ordinances are unconstitutional. Bishop Estate asserts the following specific causes of action:

Count I—Deprivation of constitutional rights in violation of 42 U.S.C. § 1983;

Count II—Ordinance 91–96 is facially unconstitutional in that it effects an impermissible taking in violation of the Fifth and Fourteenth Amendments;

Count III—Ordinance 91–96 is facially unconstitutional in that it violates Bishop Estate's substantive due process rights under the Fifth and Fourteenth Amendments;

Count IV—Ordinance 91–96 is facially unconstitutional in that it violates Bishop Estate's procedural due process rights under the Fourteenth Amendment;

Count V—Ordinance 91–96 is facially unconstitutional in that it violates Bishop Estate's equal protection rights under the Fourteenth Amendment;

Count VI—Ordinance 91–96 unreasonably and substantially impairs Bishop Estate's contract rights in violation of Article I, Section 10 of the Constitution;

Count VII—Ordinance 91–95 is facially unconstitutional in that it effects an im-

permissible taking in violation of the Fifth and Fourteenth Amendments;

Count VIII—Ordinance 91–95 is facially unconstitutional in that it violates Bishop Estate's substantive due process rights under the Fifth and Fourteenth Amendments;

Count IX—Ordinance 91–95 is facially unconstitutional in that it violates Bishop Estate's equal protection rights under the Fourteenth Amendment;

Count X—Ordinance 91–96 violates several provisions of the Constitution of the State of Hawaii;

Count XI—Ordinance 91–95 violates several provisions of the Constitution of the State of Hawaii;

Count XII—Ordinance 91–96 conflicts with various statutes of the State of Hawaii; and

Count XIII—Ordinance 91–95 conflicts with various statutes of the State of Hawaii.

Bishop Estate seeks declaratory relief as well as attorneys' fees, costs, and interest.

On February 14, 1992, Bishop Estate filed a motion for partial summary judgment on Counts I, II, III, VI, XII, and XIII. On June 8, 1992, the HALE Coalition filed a motion for partial summary judgment on the remaining counts of the complaint. On June 9, 1992, the City filed a cross motion for summary judgment on all counts.

## DISCUSSION

### I. ORDINANCE 91–96

#### A. *Background*

Ordinance 91–96 imposes a ceiling on renegotiated lease rents for ground leases of owner-occupied residential condominium units in Honolulu. In the "Findings and Purpose" section of Ordinance 91–96, the City found that there were 25,203 owner-occupied condominium housing units in Honolulu in 1987. Ord. 91–96 § 1(1)(A). The City further found that 16,291 of such units, or approximately 65% of the total, were on leased land.[2] *Id.* § 1(1)(B). The

---

1. The court will refer to the City and County of Honolulu as "Honolulu" when discussing the geographical location and as "the City" when addressing the defendant political entity.

2. The City indicated that it had no reason to believe that this data had changed appreciably since 1987. Ord. 91–96 § 1(2).

City indicated that residential leaseholds have had, and continue to have, numerous undesirable socio-economic effects including: increases in lease rental negotiations of up to 1,000%; inequality of bargaining power favoring lessors; and increasing lease rentals forcing lessees to give up their leases and look for other accommodations. In sum, the City stated:

> The purpose of this Ordinance is to set maximum renegotiated lease rents which are affordable to condominium apartment owner-occupants and fair to lessors. This Ordinance is intended to be in conformance with [*Richardson I*].[3]

Ordinance 91–96 applies to all leases that contain provisions for renegotiation of lease rents for individual residential owner-occupant apartments. Ord. 91–96 § 1.3. An "owner-occupant" is defined as an owner of a residential apartment who, on the date of renegotiation of the lease of the residential apartment, occupies the residential apartment as the owner's principal residence. *Id.* § 1.2(a). Pursuant to the ordinance, the first renegotiation shall not be scheduled before the fifteenth year following the initial date of the lease and subsequent renegotiations shall occur no more frequently than every ten years. *Id.* § 1.4(a)(1).

Ordinance 91–96 provides that the maximum annual renegotiated lease rent shall be the initial lease rent multiplied by a rent factor. *Id.* § 1.5(b). The "initial lease rent" is the greater of the beginning lease rent specified in the lease or the reasonable market value rent prevailing at the effective date of the lease.[4] *Id.* § 1.1. Furthermore, the "rent factor" is the average consumer price index ("CPI")[5] for the six-month period in which the rent negotiation occurs divided by the average CPI in effect at the time of the effective date of the initial lease rent. *Id.* § 1.5(b).

When a lease comes up for renegotiation, the lessor and lessee are encouraged to attempt to reach agreement as to the renegotiated lease rent. *Id.* § 1.4(b). If the parties are unable to reach an agreement, however, they must proceed to arbitration. *Id.* If the lease at issue is subject to section 516D–12 of the Hawaii Revised Statutes, the arbitration shall proceed pursuant to chapter 516D. *Id.* Otherwise, the City Department of Housing and Community Development (the "Department") shall arbitrate the matter. *Id.* The Department is also charged with enforcing the provisions of Ordinance 91–96. *Id.* § 1.14.

Ordinance 91–96 also provides a mechanism for adjusting the renegotiated lease rent biennially in order to account for further changes in the CPI. *Id.* § 1.6. Furthermore, under certain narrowly-defined circumstances, the ordinance allows for an administrative adjustment of annual renegotiated lease rent to an amount higher than the maximum annual renegotiated lease rent. *Id.* § 1.7. In general terms, a lessor may petition the Department for an administrative adjustment when the lessor pays the operating expenses from lease rent proceeds and the lessor's current net operating income is less than the lessor's net operating income in the last year of the fixed rent period. *Id.* § 1.7(c). When authorized, the lease rent shall be adjusted so that the net operating income, as adjusted for inflation measured by the CPI, stays the same as the net operating income in the last year of the fixed rent period. *Id.* § 1.7(b), (c). Either the lessor or lessee may appeal the Department's approval, disapproval, or modification of a proposed adjusted lease rent. *Id.* § 1.7(g).

**3.** In *Richardson v. City and County of Honolulu,* 759 F.Supp. 1477 (D.Haw.1991) ("*Richardson I*"), this court declared unconstitutional Ordinance 91–96's predecessor, Ordinance 90–95. *Richardson I* is discussed at length later in this opinion.

**4.** In the definition of "initial lease rent," the ordinance states that initial lease rent "excludes any lease rents that reflect reduced rent at the beginning of the lease due to construction of the

project or due to special negotiations between the developer and the land owner." Ord. 91–96 § 1.1.

**5.** CPI is defined as "the Consumer Price Index for All Urban Consumers (CPI–U) for Honolulu published by the Bureau of Labor Statistics of the United States Department of Labor." Ord. 91–96 § 1.1.

Every renegotiated lease rent, whether set by agreement or arbitration, must be submitted to the Department for certification that the rent is within the applicable maximum. *Id.* § 1.9. The renegotiated lease rent shall be deemed within the maximum unless, within thirty days of the submission of the renegotiated lease rent, the Department certifies that such rent is not within the maximum. *Id.* § 1.9(d). If the Department rejects the proposed renegotiated lease rent, the lessor and lessee must continue their renegotiation. *Id.*

Any party aggrieved by the Department's action or inaction may appeal to the Department. *Id.* § 1.9(e). Upon the filing of an appeal, the Department shall (1) hold a hearing in accordance with the contested case procedures of Chapter 91 of the Hawaii Revised Statutes, and (2) issue an appropriate decision.[6] *Id.*

If an owner-occupant transfers his leasehold interest during a renegotiated rent period to another person intending to be an owner-occupant, the renegotiated lease rent shall be applicable to the new owner-occupant. *Id.* § 1.10. However, if an apartment owner ceases to be an owner-occupant or if an owner-occupant transfers his leasehold interest to a person who is not an owner-occupant, the lessor may reopen the negotiated lease rent. *Id.* § 1.12, 1.13. Once reopened, the renegotiated lease rent must be set in accordance with the lease agreement and without regard to the provisions of Ordinance 91–96. *Id.*

### B. *The Takings Clause (Count II)*
#### 1. Richardson I

In *Richardson v. City and County of Honolulu,* 759 F.Supp. 1477 (D.Haw.1991) (*"Richardson I"*), this court considered the constitutionality of Ordinance 91–96's statutory predecessor, Ordinance 90–95. This court held that Ordinance 90–95 violated the Takings Clause of the United States Constitution. As the City drafted Ordinance 91–96 so as to attempt to correct the constitutional deficiencies of Ordinance 90–95, it is necessary to review *Richardson I.*

Ordinance 90–95 was designed to impose a maximum ceiling on renegotiated lease rents for residential condominiums in Honolulu. The ordinance provided that the renegotiated annual ground rent shall not exceed the initial lease rent paid at the beginning of the lease term multiplied by a "rent factor." *Richardson I,* 759 F.Supp. at 1479. The rent factor was an average of an "inflation factor" and an "income factor." *Id.* The lessors were bound by the rent figure determined by this formula regardless of whether the initial rent paid by the lessee reflected the market value of the property at the time the lease began. *Id.* at 1480.

The court further explained:

> The maximum renegotiated rents mandated by the Ordinance apply for the full renegotiated rent period and are not readjusted to reflect changes in the [indexes for the inflation and income factors] which might occur during that time. The Ordinance does not take into consideration the location or any other unique or particular characteristics of the property. There is no administrative procedure for appeal; and no governmental body has been established or designated in the Ordinance for the purpose of interpreting and applying the Ordinance's provisions.

759 F.Supp. at 1480.

The court held that Ordinance 90–95 was unconstitutional under the Fifth Amendment's Takings Clause because: (1) the ordinance did not allow lessors a reasonable rate of return; and (2) the ordinance's means did not rationally further its public purpose.

The court found that Ordinance 90–95 on its face deprived lessors of a just and rea-

---

**6.** The drafters of Ordinance 91–96 apparently attempted to take into account the potential conflict between Hawaii Revised Statutes chapter 658 which governs the finality of arbitration awards and section 1.9 of Ordinance 91–96. Section 1.9(f) provides that if a court of competent jurisdiction rules, or the state attorney general or corporation counsel opines, that a renegotiated lease rent set by arbitration may be vacated, modified, or corrected only pursuant to chapter 658, then a petition seeking such action shall be subject to chapter 658 and the parties may not appeal to the Department.

sonable rate of return because the rent ceiling was based on the amount of rent paid by the lessee during the first year of the lease. 759 F.Supp. at 1489. The undisputed evidence in the case showed that the rent paid by lessees during the first year of their leases was often far below market value. *Id.* at 1490. The court further determined that Ordinance 90–95 was unconstitutional because it did not provide a mechanism for periodic review of the rent ceilings imposed in order to ensure that lessors are continuously afforded a fair rate of return. *Id.* at 1491.

Additionally, while the court found that Ordinance 90–95 had a legitimate public purpose, it determined that the ordinance did not reasonably further the ordinance's goal of reducing the cost of leasehold housing for the people of Hawaii. 759 F.Supp. at 1493. The evidence in the case demonstrated that the ordinance applied to numerous types of condominiums which are not rented by lessees seeking residential housing. *Id.* at 1494. In fact, the evidence showed that only about 37% of all residential leasehold condominiums on Oahu were owner-occupied. As Ordinance 90–95 applied only to renegotiated annual ground rents, the court noted that it was inapplicable to sublessees who are the majority of the occupiers of condominiums.

The court summarized the problems of Ordinance 90–95 as follows:

> To the extent that the drafters intended to provide renters with more affordable housing, the approach chosen by the drafters of Ordinance 90–95 is not constitutionally rational. First, the Ordinance does not place any restrictions on rents charged to occupants by sublessors. Second, the terms of the Ordinance apply not only to residential condominiums but also to commercial condominiums. Third, the Ordinance does not take into consideration the individual characteristics or market value of any piece of property in determining the maximum allowable renegotiated rent. Finally, no governmental agency has been designated to interpret the Ordinance, oversee its appli-

cation, or evaluate whether the rent ceiling is reasonable in every case.

759 F.Supp. at 1494.

While the court determined that Ordinance 90–95 was unconstitutional, the court noted:

> Careful review and analysis of constitutional law and precedent convinces this court that a properly crafted ordinance, the purpose of which is to limit lease rent increases, can pass constitutional muster.... This court *does* not hold that *every* effort to regulate rent renegotiations would be unconstitutional. Rather, the court finds that *this particular ordinance* is unconstitutionally overbroad.

*Id.* at 1479, 1488.

### 2. General Taking Analysis

The Takings Clause of the Fifth Amendment to the United States Constitution states that "private property [shall not] be taken for public use, without just compensation." The Takings Clause applies to the states through the Fourteenth Amendment. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 244 n. 7, 104 S.Ct. 2321, 2331 n. 7, 81 L.Ed.2d 186 (1984). Moreover, a state may delegate its power to condemn to a municipality. *Cf. Jacobson v. Tahoe Regional Planning Agency,* 566 F.2d 1353 (9th Cir.1977), *aff'd in part and rev'd in part on other grounds,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). "When the power to condemn has been delegated to a municipality, the municipality acts under color of state law, and therefore the prohibitions of the fifth and fourteenth amendments apply." *Richardson I,* 759 F.Supp. at 1487.

The Supreme Court has consistently distinguished "physical takings" from "regulatory takings." A physical taking occurs when a governmental entity authorizes a permanent physical occupation of real property. On the other hand, the regulatory taking issue typically arises when a government regulation, such as a zoning regulation or a rent control law, affects a property owner's ability to use his land. The distinction between a physical taking and a regulatory taking is signifi-

cant because the Supreme Court has applied vastly different standards to the two types of takings.

### 3. Physical Taking

■ The Supreme Court addressed at length the issues regarding a physical taking in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In that case, the defendant cable television company installed a cable on the roof of the plaintiff's apartment building. The company's actions were in accordance with a New York law which required a landlord to permit a cable television company to install its cable facilities upon his property. The issue in the case was "whether a minor but permanent physical occupation of an owner's property authorized by government constitutes a 'taking' of property for which just compensation is due under the Fifth and Fourteenth Amendments of the Constitution." *Id.* at 421, 102 S.Ct. at 3168. The Supreme Court held that any permanent physical occupation constitutes a per se taking thereby requiring just compensation. *Id.* at 426–441, 102 S.Ct. at 3170–79.

The instant case does not involve an actual permanent physical occupation as was present in *Loretto*. Nonetheless, Bishop Estate relies on a series of decisions from the courts of appeals which held that certain mobile home park rent control ordinances effected "physical takings," similar to the type of taking in *Loretto*. These

ordinances allegedly transferred possessory rights in the mobile home park from the owners to the tenants by essentially giving tenants a transferable right to a perpetual lease at below-market rental rates. *See Azul Pacifico, Inc. v. City of Los Angeles*, 948 F.2d 575 (9th Cir.1991), *opinion withdrawn on other grounds*, 973 F.2d 704 (9th Cir.1992);[7] *Pinewood Estates v. Barnegat Township Leveling Bd.*, 898 F.2d 347 (3d Cir.1990); *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1986), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988).

The physical taking analysis in the aforementioned cases, however, was overruled by the Supreme Court's recent opinion in *Yee v. City of Escondido*, —— U.S. ——, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). In *Yee*, the plaintiff mobile home park owners challenged a local mobile home park rent control ordinance. The park owners alleged that the ordinance constituted a physical taking under *Loretto*.[8] Rejecting the owners' arguments, the Supreme Court held that a physical taking occurs only when the government requires the landowner to submit to the physical occupation of his land. *Id.* 112 S.Ct. at 1528. The Court emphasized that the mobile home park owners voluntarily rented their land to the tenants; the park owners' tenants were invited by the park owners, not forced upon them by the government. *Id.* The Court explicitly rejected the rationale of *Hall* and *Pinewood Estates*. *Id.* at 1527

---

7. In *Azul–Pacifico*, the Ninth Circuit granted a petition for rehearing and withdrew its previous decision reported at 948 F.2d 575. On rehearing, the court did not address the takings clause issues, but it vacated the lower court's judgment *on other grounds*. In particular, the court held: (1) the plaintiff could not bring a direct constitutional claim without utilizing 42 U.S.C. § 1983; and (2) the claims were barred by the statute of limitations.

8. The Court summarized plaintiffs' argument as follows:

> Because under the California Mobilehome Residency Law the park owner cannot evict a mobile home owner or easily convert the property to other uses, the argument goes, the mobile home owner is effectively a perpetual tenant of the park, and the increase in the mobile home's value thus represents the right

to occupy a pad at below-market rent indefinitely. And because the Mobilehome Residency Law permits the mobile home owner to sell the mobile home in place, the mobile home owner can receive a premium from the purchaser corresponding *to this increase in value*. The amount of this premium is not limited by the Mobilehome Residency Law or the Escondido ordinance. As a result, petitioners conclude, the rent control ordinance has transferred a discrete interest in land—the right to occupy the land indefinitely at a sub-market rent—from the park owner to the mobile home owner. Petitioners contend that what has been transferred from park owner to mobile home owner is no less than a right *of physical occupation of the park owner's* land.

112 S.Ct. at 1528.

("We granted certiorari ... to resolve the conflict between the decision below [dismissing the complaint] and those of two of the federal Courts of Appeals in *Hall* [and *Pinewood Estates.*]).

Additionally, the Court found that the factual circumstances in *Yee* were similar to the case of *FCC v. Florida Power Corp.*, 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987). In that case, the plaintiff utility company leased space on its utility poles to cable television companies for the installation of cables. Pursuant to federal agency action, the annual rent of several cable companies was reduced from between $7.15—$5.50 per pole to $1.79 per pole annual rent. Rejecting the utility's physical taking argument, the Supreme Court explained:

[The utility contends,] in essence, that it is a taking under *Loretto* for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79. But it is the invitation, not the rent, that makes the difference. The line which separates these cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license.

Pursuant to the Supreme Court's holdings in *Florida Power* and *Yee*, this court finds that there is no physical taking in the present case. In support of their physical taking allegation, Bishop Estate relies almost entirely on *Hall, Pinewood Estates,* and *Azul–Pacifico.* Yet the physical taking rationale of these cases was specifically rejected in *Yee*. Moreover, the condominium lessees in the present case are entirely analogous to the tenants in *Florida Power* and *Yee*. The lessees are occupying their condominiums as a result of leases extended by the lessors, not as a result of governmental mandate. The City did not require the lessors to be subject to physical occupation of their land.

### 4. Regulatory Taking

#### a. *Applicable Law*

The long-standing rule regarding regulatory takings was enunciated by Justice Holmes: "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). With respect to the regulation of housing, the Supreme Court has indicated:

This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all injuries that such regulation entails.... So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity.

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982) (citing, among others, the following two rent control cases: *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); and *Block v. Hirsh*, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921)).

The seminal case regarding regulatory takings is *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). In that case, pursuant to the City of New York Landmarks Preservation Law,[9] the Grand Central Terminal ("Terminal"), owned by plaintiff Penn Central Transportation Company ("Penn Central"), was designated as a historic landmark. After Penn Central's proposal to build a 55–story office building on

---

**9.** The City of New York enacted the Landmarks Preservation Law which created a commission having the power to designate historic landmarks in New York City. Once a site is designated as a landmark numerous restrictions attach to the property owner's use of the property. In order to partially offset the effect of these restrictions, landmark owners who have not developed their property to the extent otherwise allowed by the general zoning laws are allowed to transfer their development rights to other parcels in the vicinity. 438 U.S. at 109–114, 98 S.Ct. at 2651–54.

top of the Terminal was rejected,[10] it filed suit alleging that the application of the Landmarks Preservation Law to the terminal constituted a "taking" in violation of the Fifth and Fourteenth Amendments.

The Supreme Court held there was no taking. The Court explained that the taking analysis involves essentially ad hoc, factual inquiries involving several factors. 438 U.S. at 124, 98 S.Ct. at 2659. The Court indicated that a court must consider the economic impact of the regulation on the plaintiff, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the government action. *Id.*

The Supreme Court rejected Penn Central's argument that the Landmarks Preservation Law effected a taking because its operation significantly diminished the value of the Terminal site. 438 U.S. at 131, 98 S.Ct. at 2662. Of particular importance, the Court noted that Penn Central had conceded that the parcel of land occupied by the Terminal was, at the time of the lawsuit, capable of earning a reasonable return. *Id.* at 129, 98 S.Ct. at 2661. Accordingly, the Court held that while the Landmark Preservation Law undeniably interfered with Penn Central's profit-making ability, the law still afforded Penn Central a reasonable return on its investment. 438 U.S. at 136–37, 98 S.Ct. at 2665–66.

■ While *Penn Central* provides the general framework for evaluating a regulatory taking claim, subsequent federal and state cases have refined the analysis with respect to rent control laws. A rent control scheme must guarantee efficient landlords/lessors a just and reasonable rate of return on their investments. *Pennell v. City of San Jose,* 485 U.S. 1, 13, 108 S.Ct. 849, 858, 99 L.Ed.2d 1 (1988); *Cromwell Assocs. v. Newark,* 511 A.2d 1273, 1275 (N.J.Super.Ct.Law Div.1985) (rejecting any percentage limitation on a landlord's ability to seek rent increases under a landlord hardship provision). In addition to the just and reasonable rate of return requirement, rent control legislation must substantially advance legitimate public interests. *Rich-*

ardson I, 759 F.Supp. at 1493 (citing *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)).

### b. *Individualized Consideration*

■ As indicated above, this court set forth four reasons in *Richardson I* why the approach of Ordinance 90–95, Ordinance 91–96's predecessor, did not substantially advance the purpose of the law. One of the stated problems with Ordinance 90–95 was that "the Ordinance [did] not take into consideration the individual characteristics or market value of any piece of property in determining the maximum allowable renegotiated rent." *Richardson I,* 759 F.Supp. at 1494–96. In drafting Ordinance 91–96, the City failed to adequately address this significant defect.

The requirement of individualized consideration is apparent from other cases which have addressed taking issues. For example, in *Midkiff,* the United States Supreme Court upheld the State of Hawaii's Land Reform Act of 1967. Yet the Land Reform Act allowed the parties affected by the condemnation to present evidence of the fair market value of the subject property. *Midkiff,* 467 U.S. at 234 & n. 2, 104 S.Ct. at 2326 & n. 2 (citing Haw.Rev.Stat. § 516–56); *see also Richardson I,* 759 F.Supp. at 1494–96.

With respect to taking challenges to rent control laws, courts have recognized:

> The very nature of rent control requires that a limit be placed on rent increases. Such limits have been held valid providing a safety valve, such as a hardship mechanism, exists which can assure an efficient landlord a fair return.... "[E]very rent control ordinance must be deemed to intend, and will be so read, to permit property owners to apply to the local administrative agency for relief on the ground that the regulation entitles the owner to a just and reasonable return."

*Cromwell Assocs. v. Newark,* 511 A.2d 1273, 1275 (N.J.Super.Ct.Law Div.1985) (citing and quoting *Hutton Park Gardens v.*

---

**10.** Penn Central would have received $1–3 million annually from the proposed project.

*West Orange Town Council,* 68 N.J. 543, 350 A.2d 1 (1975)).

Recent cases which have upheld rent control laws have involved statutes which provided for some degree of individualized consideration. For instance, under the rent control scheme in *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), when a tenant objected to a landlord's proposed rent increase, a hearing officer would determine the reasonableness of the proposed increase. *Id.* at 5, 108 S.Ct. at 853. The rent control ordinance required that the hearing officer examine "the history of the premises, the landlord's costs, and the market for comparable housing." *Id.* at 13, 108 S.Ct. at 858. The ordinance also allowed the landlord to present any other relevant financial evidence pertaining to the property. *Id.*

Moreover, even rent control schemes which have been declared unconstitutional have typically contained some mechanism for individualized consideration. *See, e.g. Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 130 Cal.Rptr. 465, 493, 550 P.2d 1001, 1029 (1976) (landlords may petition rent control board for a rent adjustment); *Cromwell Assocs.,* 511 A.2d at 1274 (rent control ordinance permitted board-approved increases in cases where the proofs demonstrate that a particular hardship forecloses on a landlord's ability to obtain a fair rate of return defined by the ordinance as an 11.5% return on investment).

In *Yee v. Escondido,* —— U.S. ——, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), the mobile home rent control ordinance in question prohibited rent increases without the approval of the city council. *Id.* 112 S.Ct. at 1527. However, mobile home park owners were allowed to apply for a rent increase at any time. *Id.* The city council was required to approve any increases which it deemed "just, fair, and reason-able" after considering a non-exclusive list of eleven factors most of which pertained to the individual mobile home pads at issue. *Id.*

In contrast to the aforementioned cases, absolutely nothing in Ordinance 91–96's regulatory scheme accounts for the many unique factors, such as the rate of development in surrounding areas, which may affect the value of an individual parcel of real property at the time of renegotiation. At the hearing, the City conceded this fact.[11] To reiterate, the maximum annual renegotiated lease rent under the provisions of Ordinance 91–96 is determined solely on the basis of the *initial lease rent* and the *rent factor derived from the CPI.* The problem of lack of individual consideration in determining the renegotiated lease rent is compounded by the absence of any mechanism, such as a variance, for obtaining relief for special circumstances. *See Cromwell Assocs. v. Newark,* 511 A.2d 1273, 1275 (N.J.Super.Ct.Law Div.1985) (discussing the need for a safety valve or hardship mechanism with respect to rent control laws).

Ordinance 91–96's lack of individualized consideration is further exacerbated by the notable absence of any meaningful review process. *See Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 130 Cal.Rptr. 465, 550 P.2d 1001 (1976). In *Birkenfeld,* the California Supreme Court recognized that even when a rent control ordinance provides adequate standards for determining rental rates, the ordinance must provide procedural safeguards against unfairness in situations where the statutorily-determined rate would be unfair. *Id.* 130 Cal.Rptr. at 493–97, 550 P.2d at 1029–32.

The arbitration and appeal process in Ordinance 91–96 is focused exclusively on determining the correct initial lease rent and

---

11. The City argued that individual considerations are accounted for in the setting of the initial lease rent at the time the lease is originated. While this may be true, the individual characteristics of a piece of property often are significantly different at the time of renegotiation than they were at the initial date of the lease which could be several decades earlier. This court need only call attention to the massive redevelopment presently underway in the Kakaako area and the planned substantial redevelopment of the Honolulu waterfront. Both of these redevelopment projects are within the City and County of Honolulu and will without question have a marked effect on property values in condominiums within, abutting, or in the vicinity of these areas.

the rent factor from which the maximum annual renegotiated lease rent is calculated. The ordinance does *not* permit the arbitrator or the Department of Housing and Community Development to consider any other factors. At the hearing on these motions, the City conceded that the arbitration and appeal procedures are restricted to solely determining whether the maximum annual renegotiated lease rent is calculated properly under the statutory formula.

A review of the arbitration and appeal mechanism of Ordinance 91–96 reveals its inadequacies. If the lessor and lessee are unable to agree on an renegotiated lease rent, the parties must proceed to arbitration. Ord. 91–96 § 1.4(b). In arbitration, however, the arbitrator is restricted to determining the maximum renegotiated lease rent pursuant to the ordinance's formula of initial lease rent multiplied by the rent factor. *Id.* § 1.5. The arbitrator has no authority or discretion to consider any other factors in determining the maximum renegotiated lease rent. Furthermore, while all renegotiated lease rents must be certified by the City Department of Housing and Community Development, the Department's role is similarly restricted to merely ensuring compliance with the statutory formula for determining maximum renegotiated lease rent. *Id.* § 1.9.[12]

The City contends that lessors are ensured a fair rate of return by Ordinance 91–96's two types of adjustments: (1) the biennial adjustment for inflation (§ 1.6); and the administrative adjustment for increased operating expenses (§ 1.7). The court finds that neither of these adjustments provides the type of relief which is constitutionally mandated.

The biennial adjustment allows the previously determined maximum renegotiated lease rent to increase in accordance with the average consumer price index. Ord. 91–96 § 1.6. However, if the maximum renegotiated lease rent is originally set at a confiscatory rate, the biennial adjustment provides no relief from that confiscatory rate.[13] In other words, if the renegotiated lease rent is originally set at a confiscatory rate, the biennial adjustment merely prevents that confiscatory rate from becoming even more confiscatory by attempting to adjust the rate for inflation.

With respect to the administrative adjustment, that provision only applies if the lessor pays the operating expenses for the condominium exclusively from the lease rent proceeds. Ord. 91–96 § 1.7(c)(2), (d)(3). However, the uncontradicted evidence before the court indicates that lessors "almost never assume the obligation to pay a condominium project's operating expenses, and if such an obligation is assumed, the expenses are not paid exclusively from lease rent proceeds, but are paid through separate charges." Aff. of Paul J. Cathcart ¶ 3 (attached to Bishop Estate Mot. Partial Summ. J. filed 2/14/92). Thus, the court finds that the administrative adjustment provision is largely irrelevant.

Accordingly, the court finds that Ordinance 91–96 violates the Fifth Amendment's Takings Clause because it does not provide for consideration of individual factors which may affect the value of a particular parcel of real property at the time of renegotiation. Furthermore, Ordinance 91–96 is infirm because it does not account for situations in which the renegotiated lease rent formula does not provide the

---

12. In addition, any party aggrieved by the Department's action or inaction may appeal to the Department under the contested case procedures of chapter 91 of the Hawaii Revised Statutes. Ord. 91–96 § 1.9(e). Nonetheless, on appeal, there is no evidence to suggest that the Department has the authority to provide any form of relief other than ensuring compliance with Ordinance 91–96's rent formula. Furthermore, this appeal process may be nullified if a court rules, or the State attorney general or the City corporation counsel opines, that the right

to appeal to the Department conflicts with chapter 658 of the Hawaii Revised Statutes.

13. Additionally, the court notes that the lessor is not automatically entitled to the biennial adjustment; the Department must approve such an adjustment. Ord. 91–96 § 1.6(a). As Ordinance 91–96 contains no standards for the Department to apply in determining whether to grant a biennial adjustment, the Department apparently has unlimited discretion to either grant or deny a biennial adjustment.

lessor with a fair rate of return. In other words, there is no meaningful mechanism for obtaining relief when the lease rent formula results in a confiscatory rate.

### c. Ground lease premium

■ In addition to Ordinance 91–96's lack of individualized consideration, Bishop Estate also argues that the ordinance fails to substantially advance its public purpose because it allows a lessee to monetize a below-market rate renegotiated lease rent at the expense of the lessor. Pursuant to Ordinance 91–96, if an owner-occupant transfers his leasehold interest in a residential condominium unit to another person intending to be an owner-occupant, the renegotiated lease rent is assigned and applicable to the new owner-occupant.[14] Ord. 91–96 § 1.10. Bishop Estate contends that this provision allows an owner-occupant with a below-market rate renegotiated lease rent to sell his condominium and receive a monetary premium for the below-market rate lease rent.

In the mobile home rent control cases discussed above, the various ordinances all contained provisions which allowed tenants to transfer their rights to below-market rental rates to other buyers. *See Yee v. Escondido,* — U.S. —, 112 S.Ct. 1522, 1528–30, 118 L.Ed.2d 153 (1992); *Azul Pacifico, Inc. v. City of Los Angeles,* 948 F.2d 575, 581–82 (9th Cir.1991), *opinion withdrawn on other grounds,* 973 F.2d 704 (9th Cir.1992); *Pinewood Estates v. Barnegat Township Leveling Bd.,* 898 F.2d 347 (3d Cir.1990); *Hall v. City of Santa Barbara,* 833 F.2d 1270, 1278–80 (9th Cir.1986), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). The courts in those cases uniformly recognized the constitutional concerns inherent in such schemes.

The problem with rent control plans which permit the tenant to transfer his right to below-market rates is the tenant's ability to command a premium for his right. *See generally,* Werner Z. Hirsch & Joel G. Hirsch, *Legal–Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol,* 35 UCLA L.Rev. 399 (1988). In the mobile home cases, the premium represented the right to occupy the mobile home pad at a below-market rate. In the present case, the premium would represent the lessee's right to a below-market rate renegotiated ground lease rent. Thus, the right to receive the premium between the rent-controlled rate and the market rate is transferred from the landlord/lessor to the tenant/lessee; this interest is worth the capitalized value of the difference between market rent and the controlled rent.

In *Hall,* the Ninth Circuit recognized the numerous Supreme Court cases which have upheld rent control laws. 833 F.2d at 1278 & nn. 19–20. The court commented, however, that none of the cases upholding rent control involved a situation in which the tenant could transfer his right to below-market rental rate to others in order to reap a monetary windfall. *Id.* The court emphasized:

> This is not a minor difference; it is crucial. The fact that the tenant can sell his interest to third parties drastically affects the economic realities of the landlord/tenant relationship. The typical rent control statute modifies the landlord/tenant relationship somewhat to protect tenants from perceived evils of the free-enterprise system....
>
> That tenants normally cannot sell their rights in rent controlled property provides important safeguards for landlords.... If [tenants] are denied the right to cash out, tenants can enjoy the benefits of rent control only so long as they remain tenants, not beyond. When the premises become vacant, the landlord is able to reassert a measure of control over the property.

*Id.* at 1279.

The Third Circuit also adopted the reasoning of *Hall* in *Pinewood Estates.* In the spring of 1992, the Supreme Court com-

---

**14.** The court notes that the renegotiated lease rent is not assignable if an owner-occupant transfers his leasehold interest to a new owner who does not intend to be an owner-occupant. Ord. 91–96 § 1.13. Nonetheless, this fact does not alleviate the problems associated with assignments to new owners who do intend to be owner-occupants.

mented on the premium issue in *Yee v. Escondido*, — U.S. ——, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).[15] The Supreme Court in *Yee* indicated that while the rent control premium issue was not relevant to a physical taking argument, the premium factor was likely relevant with respect to a regulatory taking analysis.[16] — U.S. at ——, ——, 112 S.Ct. at 1528, 1530. In particular, the Court explained:

> [The mobile home park owners] are correct in citing the existence of this premium as a difference between the alleged effect of the Escondido ordinance and that of an ordinary apartment rent control statute. Most apartment tenants do not sell anything to their successors (and are often prohibited from charging "key money"), so a typical rent control statute will transfer wealth from the landlord to the incumbent tenant and all future tenants. By contrast, [the mobile home park owners] contend that the Escondido ordinance transfers wealth only to the incumbent mobile home owner. This effect might have some bearing on whether the ordinance causes a *regulatory* taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance. ... But it has nothing to do with whether the ordinance causes a *physical* taking.

112 S.Ct. at 1530 (underlining added).

In the present case, the court finds that the principles relating to "premiums" in the mobile home context are applicable to the condominium market.[17] Like mobile home park tenants, owner-occupants of leasehold condominiums own their housing unit, the condominium itself, but lease the underlying land. Moreover, the below-market rate lease rent which applies to the mobile home tenants and leasehold condominium owner-occupants is transferable to a subsequent purchaser of the mobile home pad or condominium. With respect to both mobile homes and condominiums, the availability of a below-market rate lease rent necessarily increases the value of the subject housing unit, thereby allowing a seller to command a premium upon the sale of the housing unit. This transfer of wealth problem is generally not a concern in the area of apartment rent control because apartment rentals do not involve the ownership component present in mobile homes or condominiums.[18]

The court finds that Ordinance 91–96 enables an owner-occupant to charge a premium, in connection with the sale of a leasehold condominium with a below-market rate renegotiated lease rent, thereby operating to transfer value from the lessor to the lessee/seller. In light of the reasoning of the aforementioned mobile home park cases, and the analogous effects of the mobile home park laws regarding rent control and Ordinance 91–96, the court finds that the availability of the premium and the resulting transfer of wealth from the lessor to the lessee under Ordinance 91–96 violates the Takings Clause.[19]

**15.** As mentioned in the physical taking discussion above, the Supreme Court in *Yee* rejected the notion set forth in *Hall* and *Pinewood Estates* that the mobile home rent control laws effected a physical taking. 112 S.Ct. at 1528–31.

**16.** The Court declined to fully address the regulatory taking claim because that issue was not included in the question on which certiorari was granted. 112 S.Ct. at 1531–34.

**17.** While Ordinance 91–96 has not yet been in operation, the court notes that the "premium" argument is ripe because this case involves a facial challenge to the ordinance. In *Yee,* the Supreme Court held that an analogous facial challenge was ripe. 112 S.Ct. at 1532.

**18.** The Hirschs elaborate:

> If a rent control ordinance [pertaining to apartments] allowed alienation of a tenant's rights and benefits under rent control, presumably apartment tenants could gain a benefit similar to the placement value given to mobile home park tenants. A "key money" (money spent to obtain a rent-controlled apartment, usually illegally) feature to apartment rent controls might give the tenant a similar ability to monetize the benefits of rent control.

Hirsch & Hirsch, *supra,* at 425 n. 87.

**19.** As the court finds Ordinance 91–96 to be unconstitutional under the Taking Clause, it need not address Bishop Estate's due process (Counts III and IV), equal protection (Count V), contracts clause (Count VI), or state law claims (Counts X and XII) claims regarding Ordinance 91–96.

## II. ORDINANCE 91–95

### A. *Background*

Ordinance 91–95 involves a mechanism for the transfer of the fee simple interest of leasehold property from condominium lessors to condominium lessees in Honolulu. In the "Findings and Purpose" section of Ordinance 91–95, the City found that there are approximately 16,000—17,000 residential condominium, cooperative and planned development units on leased land on Oahu.[20] Ord. 91–95 § 1. The City further found that the owners of such leased land had generally refused to sell proportionate shares in the land underlying such units. *Id.* As a result of this practice, the City determined that there exists "a serious shortage of fee simple residential condominium land, cooperative housing unit land and planned development land and [ ] an artificial inflation of the value of such land on Oahu." *Id.*

Accordingly, the City concluded that owners of condominiums on leased land should be able to acquire the proportionate share of leased land underlying their units at a fair and reasonable price. *Id.* In order to accomplish this objective, the City decided to use its eminent domain power to condemn the fee simple title to the land underlying condominiums, pay just compensation to the lessors/owners of such land, and sell the land to the condominium owners. *Id.*

The City Department of Housing and Community Development ("Department") is charged with administering, enacting appropriate rules, and enforcing Ordinance 91–95. Ord. 91–95 §§ 1.7, 1.8. Article 2 of Ordinance 91–95 governs the condemnation of condominium development leaseholds.[21] The condemnation procedures are triggered once at least twenty-five of the condomini-um owners within the development or the owners of 50% of the condominium units, whichever is less, apply to the Department to purchase the leased fee interest. *Id.* § 2.2(a)(1). After such an application, the Department must publish notice and hold a public hearing to determine whether the acquisition of the leased fee interest will effectuate the public purposes of the ordinance. *Id.* § 2.2(a)(2).

Within twelve months after the Department has designated a condominium development, or portion thereof, for acquisition, the Department must institute eminent domain proceedings unless the parties voluntarily agree to a sale of the property. Ord. 91–95 § 5.2. The compensation to be paid for the acquired property shall be the fair market value of the leased fee interest determined as of the date of the summons of the complaint in the eminent domain proceeding. *Id.* § 5.3.

After the City has acquired the subject land, authorized condominium lessees must purchase the underlying land within sixty days of acquisition. *Id.* § 2.3. In order to be eligible to buy the leased land, a purchaser must satisfy a list of seven requirements. *Id.* § 2.4.

### B. *Takings Clause (Count VII)*[22]

#### 1. Hawaii Housing Authority v. Midkiff

■ As Ordinance 91–95 involves leasehold conversion via eminent domain, the court notes that this general issue has been thoroughly addressed by the Supreme Court in a very similar case, *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). In that case, the plaintiffs challenged the State of Hawaii's Land Reform Act of 1967 which created a mechanism for condemning residential lots occupied by single-family homes on which the underlying land was

---

**20.** For the sake of simplicity, the court will refer to all condominium apartments, cooperative housing units, and planned development units covered by Ordinance 91–95 as "condominiums," unless otherwise indicated. While the court recognizes the legal distinctions between these forms of apartment ownership, such distinctions are not relevant to the issues at hand.

**21.** Articles 3 and 4 contain similar provisions relating to cooperative housing development leaseholds and residential planned development leaseholds, respectively.

**22.** The court notes that much of the law regarding the Takings Clause has been discussed above with respect to Ordinance 91–96. Accordingly, the court will not repeat the general discussion of Takings Clause law.

leased, and transferring ownership of the condemned fees simple to the lessees. As Ordinance 91–95 is modeled after the Land Reform Act, many of the procedural aspects of the Land Reform Act are similar, if not identical, to the provisions of Ordinance 91–95 as explained above.[23]

The Supreme Court in *Midkiff* rejected the plaintiffs' arguments that the Land Reform Act violated the "public use" requirement of the Fifth Amendment's Takings Clause. The Court explained that its role in reviewing the legislature's judgment regarding public use is extremely narrow. 467 U.S. at 240, 104 S.Ct. at 2329 (citing *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954)). The Court indicated that it would defer to the legislature's public use determination unless the use involves an "impossibility" or is "palpably without reasonable foundation." *Id.* 467 U.S. at 240–41, 104 S.Ct. at 2329–30. The Court further noted that "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Id.* at 241, 104 S.Ct. at 2329.

Accordingly, the Supreme Court upheld the Land Reform Act. The Court recognized that the Hawaii Legislature had determined that a land oligopoly existed and that such concentration was the cause of several types of local problems. *Id.* at 241–42, 104 S.Ct. at 2329–30. The Court reasoned that regulation of an "oligopoly and the evils associated with it is a classic exercise of a State's police powers." *Id.* at 242, 104 S.Ct. at 2330.

The Court further found that the Land Reform Act's approach to correcting the land oligopoly problem was not irrational. *Id.* The Court elaborated:

[The Land Reform Act,] like any other, may not be successful in achieving its intended goals. But "whether *in fact* the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if ... the ... [state] Legislature *rationally could have believed* that the [Act] would promote its objective." When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socio-economic legislation—are not to be carried out in the federal courts. Redistribution of fees simple to correct deficiencies in the market determined by the state legislature to be attributable to land oligopoly is a rational exercise of the eminent domain power. Therefore, the Hawaii statute must pass the scrutiny of the Public Use Clause.

467 U.S. at 242–43, 104 S.Ct. at 2330.

### 2. The Present Case

In light of the Supreme Court's holding and reasoning in *Midkiff* as well as the similarity between the Land Reform Act and Ordinance 91–95, the court finds little merit to Bishop Estate's taking argument regarding Ordinance 91–95. Bishop Estate argues that the public purpose of Ordinance 91–95 is without reasonable foundation. In particular, Bishop Estate maintains that the ordinance is based on the incorrect assumption that a concentration

---

**23.** The Supreme Court explained the method of condemnation under the Land Reform Act as follows:

Under the Act's condemnation scheme, tenants living on single-family residential lots within developmental tracts at least five acres in size are entitled to ask the [HHA] to condemn the property on which they live. When 25 eligible tenants, or tenants on half the lots in the tract, whichever is less, file appropriate applications, the Act authorizes HHA to hold a public hearing to determine whether the acquisition by the State of all or part of the tract will "effectuate the public purposes" of

the Act. If HHA finds that these public purposes will be served, it is authorized to designate *some or all* of the lots in the tract for acquisition. It then acquires, at prices set either by condemnation trial or by negotiation between lessors and lessees, the former fee owners' full "right, title, and interest" in the land.

After compensation has been set, HHA may sell the land titles to tenants who have applied for fee simple ownership.

467 U.S. at 233–34, 104 S.Ct. at 2325–26 (citations and footnotes omitted).

of land ownership currently exists with respect to land leased for condominiums which is similar to the oligopoly which justified the Land Reform Act in the single-family home context. Bishop Estate contends that there is no concentration of land ownership in relation to leased land underlying condominium projects.

The court finds no merit to this argument. The Supreme Court in *Midkiff* repeatedly emphasized the substantial deference which should be accorded to the relevant legislative body in the area of public use. 467 U.S. at 239–43, 104 S.Ct. at 2328–31. In the present case, the City Council determined that ownership of land beneath residential condominium projects is concentrated in the hands of owners who have refused to sell proportionate shares in their fee simple titles to lessees residing in the condominium units. Ord. 91–95 § 1. Thus, the City Council's primary concern was apparently the inability of the owners of leasehold condominiums to purchase proportionate shares of the underlying fee simple title. While the current concentration of land ownership with respect to leasehold condominiums may not be as drastic as the land oligopoly which prompted the Land Reform Act,[24] this contention does not undermine the City's determination that permitting leasehold condominium owners to purchase the underlying property serves a legitimate public purpose.

Bishop Estate also argues that Ordinance 91–95 fails to provide lessors with just compensation. It claims that they are entitled to severance damages for the partial condemnation of their leased land. It also contends that Ordinance 91–95 fails to exclude the effects that Ordinance 91–96 has on the valuation of the leased fees.

Bishop Estate's argument regarding just compensation is untenable. As section 5.3 of Ordinance 91–95 provides for payment of compensation equivalent to "the current fair market value of the leased fee interest," the ordinance clearly comports with the constitutional requirements for just compensation. *See United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970).[25] Any arguments as to the proper manner of calculating current fair market value and the appropriate factors to be considered are premature in this facial challenge at this point in time.[26] *Southern Pacific v. City of Los Angeles*, 922 F.2d 498, 505–07 (9th Cir.1990) (facial takings challenge alleging denial of just compensation is not ripe unless the plaintiff has sought compensation through the available procedures), *cert. denied*, —— U.S. ——, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *see also Richardson I*, 759 F.Supp. at 1481. The City Department of Housing and Community Development has yet to enact the necessary rules to effectuate Ordinance 91–95. More importantly, the state courts have not had an opportunity to interpret and apply the compensation provisions of Ordinance 91–95. In sum, Ordinance 91–95 states that landowners shall be paid fair market value; accordingly, in the absence of evidence to the contrary, this court as-

---

**24.** Nonetheless, the court notes that Bishop Estate's own filings reveal that in 1987 the land underlying 45% of the condominium projects in Hawaii was owned by only 51 lessors. Bishop Estate Mot. Summ. J. filed 2/14/92, Ex. CC, at ii. Furthermore, at the time Ordinance 91–95 was enacted, Bishop Estate alone owned the fee simple interest under approximately 12,500 of the leasehold condominium units. Bishop Estate Mem. Opp. filed 6/29/92, at 8.

**25.** In *Reynolds*, the Supreme Court explained: And "just compensation" means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken. In enforcing the constitutional mandate, the Court at an early date adopted the concept of market value: *the*

*owner is entitled to the fair market value of the property at the time of the taking.*
397 U.S. at 16, 90 S.Ct. at 805 (footnotes omitted) (emphasis added).

**26.** The court notes that Bishop Estate's argument regarding just compensation is distinct from the reasonable rate of return inquiry associated with Ordinance 91–96. With respect to Ordinance 91–96, the court had to determine whether a taking existed. One of the factors in determining whether a taking has occurred is whether the landowner will still be able to receive a fair rate of return on his property. In contrast, as Ordinance 91–95 involves complete condemnation, it necessarily involves a taking. Thus, the pertinent question is whether the landowner receives "just compensation" for the taking.

sumes that all factors necessary to comply with constitutional requirements will be considered.[27]

C. *Substantive Due Process (Count VIII)*

■ In order to prevail on its substantive due process claim, Bishop Estate must establish that Ordinance 91–95 is "arbitrary and irrational." *Del Monte Dunes v. City of Monterey,* 920 F.2d 1496, 1508 (9th Cir.1990). Bishop Estate claims that Ordinance 91–95 does not have a legitimate government purpose and that the ordinance is not rationally related to the alleged legislative purpose. The court finds no merit to Bishop Estate's substantive due process claim.

This court rejected these same type of arguments with respect to Bishop Estate's taking claim discussed above. The court further notes that a plaintiff has an extraordinarily high burden to carry in order to demonstrate that a legislative enactment is arbitrary and irrational under the due process clause. *See Del Monte Dunes,* 920 F.2d at 1508. Moreover, courts should give substantial deference to a legislature's determination of a public use or purpose as well as the legislative means for carrying out the purpose. *Midkiff,* 467 U.S. at 239–243, 104 S.Ct. at 2328–31. In *Midkiff,* the Supreme Court specifically recognized that the use of the government's eminent domain power to effect lease-to-fee conversion is a rational response to serious housing problems. *Id.* at 242–43, 104 S.Ct. at 2330–31. The Court in *Midkiff* stated that it found no merit to the plaintiffs' due process claim and it disposed of the matter in two sentences in a footnote. *Id.* at 243 n. 6, 104 S.Ct. at 2330 n. 6.

D. *Equal Protection (Count IX)*

■ Generally, equal protection challenges are evaluated under rational-basis scrutiny to see whether the legislation at issue is irrational or wholly arbitrary. *Conti v. City of Fremont,* 919 F.2d 1385,

1389 (9th Cir.1990). Classifications based upon race, however, are presumptively invalid. *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Nonetheless, the Supreme Court has made clear that "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a *discriminatory purpose.*" *Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292 (emphasis added) (citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

■ Thus, if the official action in question is race-neutral on its face, a plaintiff asserting an equal protection claim based upon race must prove the existence of racially discriminatory intent or purpose in order to prevail. *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563. The Supreme Court has cautioned that discriminatory intent or purpose requires more than simply intent as volition or awareness of consequences. *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. A plaintiff must demonstrate that the legislation at issue was enacted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable [racial] group." *Id.; see also Stop H-3 Ass'n v. Dole,* 870 F.2d 1419, 1431–32 (9th Cir.1989).

For the purposes of the present case, a brief examination of *Feeney* is instructive. In that case, female plaintiffs challenged a Massachusetts statute which gave veterans a preference for state civil service jobs. The plaintiffs alleged that the law violated their rights under the Fourteenth Amendment's Equal Protection Clause because the statute operated overwhelmingly to the advantage of men since over 98% of veterans were male.

Initially, the Supreme Court noted that the statute was gender-neutral on its face

---

27. The Ninth Circuit has held that a determination of "fair market value" may include severance damages. *United States v. 50.50 Acres of*

*Land,* 931 F.2d 1349, 1358 (9th Cir.1991); *see generally Georgia–Pacific Corp. v. United States,* 226 Ct.Cl. 95, 640 F.2d 328 (1980).

as it distinguished only between veterans and non-veterans, not men and women. 442 U.S. at 274, 99 S.Ct. at 2293. The Court reasoned that the law could not be rationally explained on the basis of gender:

> Veteran status is not uniquely male. Although few women benefit from the preference the nonveteran class is not substantially all female. To the contrary, significant numbers of nonveterans—male as well as female—are placed at a disadvantage. Too many men are affected by [the veterans preference law], to permit the inference that the statute is but a pretext for preferring men over women.

*Id.* at 275, 99 S.Ct. at 2294. In addition, the court noted that the statute's unfortunate impact upon women was easily explained, in a gender-neutral manner, by the legislature's completely legitimate goal of aiding veterans. *Id.*

Furthermore, the Supreme Court in *Feeney* rejected the plaintiffs' allegations of gender-based discriminatory purpose. 442 U.S. at 276–80, 99 S.Ct. at 2294–97. Asserting that a person intends the natural and foreseeable consequences of his voluntary actions, the plaintiffs argued that the Massachusetts legislature must have intended to discriminate against women because the statute foreseeably and inevitably operated to the great disadvantage of women. *Id.* at 278, 99 S.Ct. at 2295. While the Court recognized the statute's foreseeable adverse consequences to women, the Court emphasized that there was no evidence that the preference for veterans was devised to harm women. *Id.* at 279, 99 S.Ct. at 2296. In essence, the purpose of the statute was clearly to help veterans, not to discriminate against women. *Id.* at 279–80, 99 S.Ct. at 2296–97.

 In the present case, Bishop Estate argues that Ordinance 91–95 intentionally discriminates against Native Hawaiians. It contends that the discrimination is demonstrated in part by the fact that Bishop

Estate and Liliuokalani Trust, two of the top five landowners affected by Ordinance 91–95, were created specifically for the benefit of Native Hawaiians.[28] Bishop Estate Mem.Opp. filed 6/29/92, at 7. However, Bishop Estate's equal protection arguments exhibit the same type of flaws as that of the plaintiffs' claims in *Feeney*.

Ordinance 91–95 is undoubtedly racially neutral on its face. Ordinance 91–95 applies to residential leasehold condominium lessors and lessees irrespective of the race or ethnic background of the affected parties. The impact of the ordinance is shared by all lessors, many of which, if not the majority, are not Native Hawaiian. Analogous to *Feeney*, too many non-Native Hawaiian lease fee owners are affected by Ordinance 91–95 to permit the inference that the statute is but a pretext for preferring non-Native Hawaiians over Native Hawaiians.

The present case is also similar to *Feeney* in that the plaintiffs have failed to establish any discriminatory intent or purpose. Like the legislators in *Feeney*, the drafters of Ordinance 91–95 were likely aware of the effect that the ordinance would have on entities, such as Bishop Estate, which are connected with Native Hawaiian ethnicity. However, in this case as well as *Feeney*, a perfectly legitimate government purpose explains the impetus of the legislation. Whereas *Feeney* involved aid to veterans, Ordinance 91–95 was enacted in response to the critical problems in the Honolulu housing market, in particular leasehold condominiums. Thus, the court finds that the City has a legitimate public purpose for enacting Ordinance 91–95 and there is no credible evidence to support the notion that Ordinance 91–95 is but a pretext for discriminating against Native Hawaiians.

## E. State Constitutional Claims (Counts XI)

 In Count XI, Bishop Estate claims that Ordinance 91–95 violates its rights un-

---

**28.** More specifically, Bishop Estate argues that the alleged discriminatory purpose of Ordinance 91–95 against Native Hawaiians is evidenced by: disproportionate impact, history of public land policy, erroneous findings of fact,

procedural irregularities in enacting the ordinance, the City's knowledge of the ordinance's impact, and the official action taken to enact the ordinance. Bishop Estate Mem.Opp. filed 6/29/92, at 5–30.

der the takings, due process, and equal protection clauses of the Hawaii State Constitution. While the Hawaii State Constitution is generally modeled after the United States Constitution, the scope of its protections are not necessarily the same. *Hawaii Housing Authority v. Lyman,* 68 Haw. 55, 704 P.2d 888, 896 (1985). However, the legal analysis of Bishop Estate's claims under the aforementioned state constitutional provisions is essentially the same as the inquiry under the corresponding sections of the United States Constitution.[29] *See, e.g. id.* 704 P.2d at 897 (takings clause); *State v. Cotton,* 55 Haw. 148, 516 P.2d 715, 719 (1973) (due process clause); *Estate of Coates v. Pacific Eng'g,* 71 Haw. 358, 791 P.2d 1257, 1260 (1990) (equal protection clause). Accordingly, for the same reasons that this court rejected Bishop Estate's federal constitutional claims above, the court similarly finds its state constitutional arguments unpersuasive.

F. *State Statutory Claims (Count XIII)*

■ In Count XIII, Bishop Estate contends that Ordinance 91-95 is preempted by various Hawaii state statutes. In particular, it claims that Ordinance 91-95 is preempted by the comprehensive provisions set forth in Hawaii Revised Statutes chapters 101 (eminent domain), 516 (residential leasehold land reform), 516D (residential leasehold condominiums and cooperatives), 519 (real property leases), 514A (condominiums), and 421H (cooperative housing corporations). For the reasons set forth below,

the court certifies the preemption question to the Hawaii Supreme Court.[30]

The United States Supreme Court has consistently approved of the use of certified questions to state supreme courts when a federal court case involves an important question of state law which is both unclear under state legal precedent and would be determinative in the instant case. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393-98, 108 S.Ct. 636, 643-46, 98 L.Ed.2d 782 (1988); *Bellotti v. Baird,* 428 U.S. 132, 150-52, 96 S.Ct. 2857, 2867-68, 49 L.Ed.2d 844 (1976); *Lehman Bros. v. Schein,* 416 U.S. 386, 389-92, 94 S.Ct. 1741, 1743-45, 40 L.Ed.2d 215 (1974); *Clay v. Sun Ins. Office,* 363 U.S. 207, 212, 80 S.Ct. 1222, 1225, 4 L.Ed.2d 1170 (1960).[31] In *Lehman,* the Supreme Court explained:

> [Use of state certification procedures] does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism. Its use in a given case rests in the sound discretion of the federal court.

416 U.S. at 391, 94 S.Ct. at 1744 (footnote omitted).

While federal courts should not abdicate their duty to decide issues properly before them by routinely certifying questions to state supreme courts, certification under appropriate circumstances can result in significant conservation of the litigants' time and money as well as judicial resources. The Ninth Circuit Court of Appeals has not hesitated to certify questions to state supreme courts when such questions involved important issues of unsettled state law which were controlling in the federal case.[32] District courts have similarly uti-

---

29. Moreover, the court notes that all of the parties have relied on the same arguments to support their positions on the state constitutional claims as they did with respect to the federal constitutional claims.

30. The court need not certify the state law questions regarding Bishop Estate's claims under the Hawaii State Constitution because there is sufficient state law to enable this court to make an informed decision on these issues. Moreover, Rule 13(a) of the Hawaii Rules of Appellate Procedure permits certification only when there is no controlling precedent in the Hawaii judicial decisions.

31. Most of the aforementioned cases as well as the succeeding cases regarding certification have extensive subsequent case histories in light of the certified questions. As these cases are mentioned only as examples of certification and not for their substantive holdings, the court will omit the subsequent case histories.

32. *See, e.g., Alaska Airlines v. United Airlines,* 902 F.2d 1400, 1403-05 (9th Cir.1990); *Morrell Constr. v. Home Ins. Co.,* 899 F.2d 875 (9th Cir.1990); *Kunz v. Utah Power & Light Co.,* 871 F.2d 85, 87-88 (9th Cir.1989); *Torres v. Goodyear Tire & Rubber Co.,* 867 F.2d 1234, 1237-39 (9th Cir.1989); *Toner for Toner v. Lederle Labs.,* 779 F.2d 1429, 1432-34 (9th Cir.1986); *Aetna*

lized the certification process. *See, e.g., Burdick v. Takushi*, 737 F.Supp. 582 (D.Haw.1990) (on remand following Ninth Circuit's reversal, district court certified three questions with respect to Hawaii election laws and write-in votes). The decision whether to certify a state law question to the state supreme court rests in the sound discretion of the federal district court. *Louie v. United States*, 776 F.2d 819, 824 (9th Cir.1985).

In order for a federal court to be able to certify a question to a state supreme court, the state court must provide a specific procedure for receiving such questions. The Hawaii Supreme Court has authorized certified questions in Rule 13 of the Hawaii Rules of Appellate Procedure. Pursuant to Rule 13(a), a federal district court may certify a question to the Hawaii Supreme Court when such question (1) concerns Hawaii law which is (2) determinative of the cause and (3) there is no clear controlling precedent in the Hawaii judicial decisions.

In the present case, the court finds that Count XIII involves issues of state law which are determinative of the validity of Ordinance 91-95. The court further finds that the there is no clear controlling precedent in the Hawaii judicial decisions which disposes of these state law issues. In particular, this court finds conflicting authority as to whether Hawaii Revised Statutes chapter 101, which governs eminent domain procedures, preempts Ordinance 91-95.

On the one hand, the Hawaii legislature enacted the Land Reform Act which has eminent domain procedures nearly identical to those of Ordinance 91-95. Thus, the Hawaii legislature has specifically autho-

rized certain types of eminent domain procedures which conflict with the general provisions of chapter 101. Furthermore, the State Attorney General has opined that Ordinance 91-95 is not preempted by state law.[33] On the other hand, relevant Hawaii statutory law seems to indicate that the City must utilize the eminent domain procedures in chapter 101 which appear to conflict with the procedures in Ordinance 91-95.

In addition the preemptory issues raised here implicate a broader question regarding the various county's authority to enact legislation in areas occupied, or at least partially occupied, by state law. While the Supreme Court of Hawaii has in the past addressed this question, as this case illustrates there remains significant room for interpretation and thus confusion. This question is of significant importance to both the counties and the state and transcends the boundaries of this case. Because this involves a pure question of state law and policy, in the final analysis it must be decided by the Hawaii Supreme Court.

This court is fully aware of the fact that certification in this case will cause some initial delay while the Hawaii Supreme Court addresses the certified question. Nonetheless, if this court were not to certify the state law preemption question, the court is confident that the Ninth Circuit Court of Appeals would itself order such certification in light of the controlling nature of the important, unsettled state law and policy issues. The court notes that the Ninth Circuit Court of Appeals has often certified questions to the Hawaii Supreme Court.[34]

*Ins. Co. v. Craftwall of Idaho*, 757 F.2d 1030, 1034 (9th Cir.1985); *Meckert v. Transamerica Ins. Co.*, 742 F.2d 505, 506–07 (9th Cir.1984).

**33.** *See* Opinion of the Attorney General of the State of Hawaii dated October 4, 1991, at 1. (Bishop Estate Mot. Partial Summ.J. filed 2/14/92, Ex. R). Nonetheless, the Attorney General did not specifically address the issue of preemption relating to chapter 101. To the contrary, the Attorney General seemed to indicate that the City must utilize its eminent domain power pursuant to the procedures provided in chapter 101. *Id.* at 2.

**34.** *See, e.g., Smith v. Cutter Biological*, 911 F.2d 374 (9th Cir.1990) (Ninth Circuit certified three questions regarding the Hawaii Blood Shield Law); *Graulty v. Bank of Hawaii*, 856 F.2d 78 (9th Cir.1988) (Ninth Circuit certified question pertaining to Hawaii Uniform Fiduciaries Act); *In re Asbestos Cases*, 829 F.2d 907 (9th Cir.1987) (Ninth Circuit certified question relating to Hawaii products liability law); *United States v. Allstate Ins. Co.*, 825 F.2d 243 (9th Cir.1987) (Ninth Circuit certified question regarding the government's ability to recover medical care costs under Hawaii law); *Kinoshita v. Canadian Pacific Airlines*, 803 F.2d 471 (9th Cir.1986)

Leaving the certification to the court of appeals would only cause further delay as well as undue confusion and uncertainty in the interim while the parties consider whether to act upon this court's decision on these purely state law issues in light of the pending appeal. Therefore, while certification will result in some initial delay, it will obviate a much greater delay and substantial confusion in the likely event the Ninth Circuit were to certify the preemption question while the case was on appeal.

Upon careful review of the relevant state law and the underlying state policy implications involved, the court finds that the purely state law preemption issue would be best answered in the first instance by the Hawaii Supreme Court. Accordingly, the court will certify this question to the Hawaii Supreme Court under Rule 13 of the Hawaii Rules of Appellate Procedure, and retain jurisdiction pending a determination by the Hawaii Supreme Court.

## CONCLUSION

In *Richardson I,* this court held that Ordinance 91–96's predecessor statute, Ordinance 90–95, was unconstitutional for a number of reasons. Subsequent to that decision, the City, in enacting Ordinance 91–96, made an attempt to remedy the problems with Ordinance 90–95. While the City managed to correct some of the constitutional infirmities of Ordinance 90–95, it failed to appropriately address other defects. For the reasons stated above, the court GRANTS Bishop Estate's motion for partial summary judgment with respect to Ordinance 91–96 finding the ordinance unconstitutional for the reasons stated herein and DENIES the City's and the HALE Coalition's motions for partial summary judgment regarding Ordinance 91–96.

With respect to Ordinance 91–95, this court has found the ordinance to be in compliance with the relevant provisions and standards of the United States Constitution and the Constitution of the State of Hawaii. Therefore, the court GRANTS the City's and HALE Coalition's motions for partial

summary judgment with respect to the federal and state constitutional claims pertaining to Ordinance 91–95 finding the ordinance in compliance with federal and state constitutional standards and DENIES Bishop Estate's motion for partial summary judgment on those same claims.

The court also CERTIFIES to the Supreme Court of Hawaii the following question:

According to Hawaii state law, is Ordinance 91–95 preempted by Hawaii Revised Statutes chapters 101, 516, 516D, 519, 514A, or 421H?

The parties are ordered to submit the appropriate certificate in accordance with this court's separate order regarding certification.

IT IS SO ORDERED.

(Ninth Circuit certified question of Hawaii contract law); *Robinson v. Ariyoshi,* 753 F.2d 1468

(9th Cir.1985) (Ninth Circuit certified six questions regarding Hawaii water law issues).